No. 15-40238

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
————————————

STATE OF TEXAS; STATE OF ALABAMA; STATE OF GEORGIA; STATE OF IDAHO;
STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF
NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA;  STATE OF UTAH; STATE OF
WEST VIRGINIA; STATE OF WISCONSIN; PAUL R. LEPAGE, Governor, State of Maine; PATRICK L.
MCCRORY, Governor, State of North Carolina; C. L. "BUTCH" OTTER, Governor, State of Idaho; PHIL BRYANT,
Governor, State of Mississippi; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA;
STATE OF FLORIDA; STATE OF ARIZONA; STATE OF ARKANSAS; ATTORNEY GENERAL BILL
SCHUETTE; STATE OF NEVADA; STATE OF TENNESSEE,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA; JEH CHARLES JOHNSON, SECRETARY, DEPARTMENT OF
HOMELAND SECURITY; R. GIL KERLIKOWSKE, Commissioner of U.S. Customs and Border Protection;
RONALD D. VITIELLO, Deputy Chief of U.S. Border Patrol, U.S. Customs and Border of Protection;
SARAH R. SALDAÑA, Director of U.S. Immigration and Customs Enforcement;
LEON RODRIGUEZ, Director of U.S. Citizenship and Immigration Services,

Defendants-Appellants.
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
————————————

BRIEF FOR THE APPELLANTS
————————————

BENJAMIN C. MIZER
  Acting Assistant Attorney General

KENNETH MAGIDSON
  United States Attorney

BETH S. BRINKMANN
  Deputy Assistant Attorney General

DOUGLAS N. LETTER
SCOTT R. McINTOSH
JEFFREY CLAIR
WILLIAM  E. HAVEMANN
  (202) 514-4052
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C. 20530-0001

## STATEMENT REGARDING ORAL ARGUMENT

The United States and other federal appellants respectfully request oral argument. Oral argument in this case of national importance will illuminate the position of the parties and aid the Court in reaching a decision.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .......................................................i

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION ..........................................................................4

STATEMENT OF THE CASE .................................................................................5

    I.     Immigration Enforcement And Prosecutorial Discretion .........................5

    II.    Deferred Action For Childhood Arrivals And For Parents Of U.S. Citizens And Lawful Permanent Residents. ..................................................9

    III.   District Court Proceedings ..........................................................................12

SUMMARY OF ARGUMENT .................................................................................14

STANDARD OF REVIEW .....................................................................................18

ARGUMENT ......................................................................................................19

    I.     PLAINTIFFS LACK STANDING TO CHALLENGE THE 2014 DEFERREDACTION GUIDANCE ........................................................19

         A.    The States' Attempt to Countermand the Federal Government's Exercise of Immigration Enforcement Discretion Is Not Justiciable .............................................................20

         B.    The District Court's Theory of "Abdication Standing" Is Baseless ..............................................................................................22

         C.    Texas' Decision to Subsidize Driver's Licenses Does Not Give It Standing ...............................................................25

         D.    Plaintiffs' Other Standing Theories Are Meritless ........................31

    II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR CLAIM THAT THE DEFERRED ACTION GUIDANCE REQUIRES NOTICE AND COMMENT ......................33

A.    The States Have No Right To Judicial Review
Under The APA ...................................................................33

B.    The Deferred Action Guidance Is A Statement
Of Policy That Does Not Require Notice and Comment.............36

III.    THE BALANCE OF HARMS AND THE PUBLIC
INTEREST WEIGH STRONGLY AGAINST THE
PRELIMINARY INJUNCTION...............................................50

IV.    THE DISTRICT COURT'S NATIONWIDE INJUNCTION IS
OVERBROAD ........................................................................54

CONCLUSION .................................................................................57

FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**:

*Adams v. Richardson*, 480 F.2d 1159(D.C. Cir. 1973) (en banc) .......................................23

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ............................32

*Am. Trucking Ass'n, v. ICC*, 659 F.2d 452 (D.C. Cir. 1981) ..............................................40

*American Hospital Ass'n  v. Bowen*, 834 F.3d 1037 (D.C. Cir. 1987) ...................................38

*Arizona v. United States*, 132 S. Ct. 2492 (2012)..........................................................passim

*Arizona DREAM Act Coalition v. Brewer ("ADAC")*,
757 F.3d 1053 (9th Cir. 2014)........................................................................................28

*Arpaio v. Obama*, 27 F. Supp. 3d 185 (D.D.C. 2014) ...................................................passim

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970) ..............................33

*Aulenback, Inc. v. FHA*, 103 F.3d 156 (D.C. Cir. 1997).................................................38

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983) ................... 37, 38

*Baylor Univ. Hosp. Center v. Heckler*, 758 F.2d 1052 (5th Cir. 1985)....................................47

*Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984) ................................................. 33, 34

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ..............................38

*Califano v. Yamasaki*, 442 U.S. 682 (1979)...............................................................55

*Chamber of Commerce v. DOL*, 174 F.3d 206 (D.C. Cir. 1999) .........................................40

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ............................................................36

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) .............................................19, 28, 30

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ............................................................... 35, 36

*Community Nutrition Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987) ............................ 39, 40

*Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145 (5th Cir. 1984) ................... 37, 39

*Dep't of Def. v. Meinhold,* 510 U.S. 939 (1993) ........................................................55

*Envtl. Def. Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981) ......................................................55

*Fed'n for Am. Immigration Reform v. Reno,* 93 F.3d 897 (D.C. Cir. 1996) ...........................36

*Fiallo v. Bell,* 430 U.S. 787 (1977) .........................................................................21

*Florida Bd. of Bar Examiners*, 134 So. 3d 432 (Fla. 2014)............................................ 48, 49

*Heckler v. Chaney*, 470 U.S. 821 (1985) .....................................................................5, 20, 33

*Henderson v. Stalder*, 287 F.3d 374 (5th Cir. 2002)....................................................... 21, 31

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) .....................35

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................................... 17, 37

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ............................................................ 21, 33

*Lion Health Servs., Inc. v. Sebelius*, 635 F3d 693 (5th Cir.  2011) .........................................55

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................23

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987)....................................................38

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .................................................................32

*Massachusetts v. Mellon*, 262 U.S. 447 (1923)...............................................................32

*Mathews v. Diaz*, 426 U.S. 67 (1976) .................................................................... 21, 22

*New Jersey v. United States*, 91 F.3d 463 (3d Cir. 1996).....................................................21

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................52

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) ...................................................27

*Perez*, 135 S. Ct. 1199 (2015) ...................................................................47

*Plyler v. Doe*, 457 U.S. 202 (1982) ..............................................................21

*Prof'ls & Patients for Customized Care v. Shalala,* 56 F.3d 592 (5th Cir. 1995) .......37, 39, 43

*Raines v. Byrd*, 521 U.S. 811 (1997) .............................................................19

*Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC"),*
525 U.S. 471 (1999) .............................................................. 6, 7, 8, 32, 34

*Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) ...................................................53

*Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013) ...............................................19

*Star Satellite, Inc. v. City of Biloxi*, 779 F. 2d 1074 (5th Cir. 1986) ...........................51

*Sure-Tan, Inc. v. NLRB,* 467 U.S. 883 (1984) .....................................................21

*Texas v. United States*, 106 F.3d 661 (5th Cir. 1997) ........................... 22, 25, 29, 36

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ..................................5

*United States v. Cox,* 342 F.2d 167 (5th Cir. 1965) (en banc) .....................................20

*Wayte v. United States*, 470 U.S. 598 (1985) .....................................................41

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .........................................................50

**Constitution:**

Article II, § 3, cl. 5; .........................................................................12
Article III ................................................................ 1, 5, 12, 15, 16, 19, 23, 26
Take Care Clause ............................................................................ 4, 12

**Statutes:**

Administrative Procedure Act:

5 U.S.C. 553 .................................................................................13
5 U.S.C. 553(b) ............................................................................36
5 U.S.C. 553(b)(A) .......................................................................14
5 U.S.C. 553(b)(2) ........................................................................47
5 U.S.C. 553(b)(3)(A) ............................................................ 36, 38
5 U.S.C. 701(a)(1) ........................................................................33
5 U.S.C. 702(a) .............................................................................33
5 U.S.C. 705 .................................................................................55

6 U.S.C. 202(5)........................................................................ 5, 52

8 U.S.C. 1103(a)(3) ........................................................................5
8 U.S.C. 1227 ...............................................................................46
8 U.S.C. 1252(g)...................................................................3, 8, 34
8 U.S.C. 1324a(a)(1) .......................................................................8
8 U.S.C. 1324a(h)(3) .......................................................................8
8 U.S.C. 1325 ...............................................................................46
8 U.S.C. 1326 ...............................................................................46
8 U.S.C. 1601 ...............................................................................48
8 U.S.C. 1611 ...............................................................................49
8 U.S.C. 1611(b)(1)........................................................................48
8 U.S.C. 1611(b)(2)........................................................................49
8 U.S.C. 1611(b)(3)........................................................................49
8 U.S.C. 1611(c).............................................................................48
8 U.S.C. 1621 ...............................................................................48
8 U.S.C. 1641(b) ...........................................................................48

18 U.S.C. 659 ...............................................................................41

28 U.S.C. 1292(a)(1) .......................................................................5
28 U.S.C. 1331 ...............................................................................4
28 U.S.C. 1346 ...............................................................................4

42 U.S.C. 405(c)(2)........................................................................49
42 U.S.C. 405(c)(2)(B)(i)(I) ...........................................................49
42 U.S.C. 405(c)(5)(A)-(J).............................................................49

42 U.S.C. 413 ...............................................................................................49
42 U.S.C. 414(a) ..........................................................................................49
42 U.S.C. 414(c) ..........................................................................................49
42 U.S.C. 414(c)2(A) ...................................................................................49
42 U.S.C. 423(a)(1)(C) ................................................................................49
42 U.S.C. 423(c) ..........................................................................................49

49 U.S.C. 30301 .............................................................................................8

*Department of Homeland Security Appropriations Act,*
  P. L. 114-4, 129, Stat 39, 43 (2015) .........................................................6

*USA PATRIOT Act of 2001*, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 ...........8

*Violence Against Women Act.*
  8 U.S.C. 1154(a)(1)(D)(i)(II), (IV) .........................................................8

P.L. 108-203, Title II, § 211 .......................................................................49

P. L. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 231, 302, .................................. 8, 28

Tex. Transp. Code 521.142(a) ....................................................................27

Tex. Transp. Code 521.1425(d) ..................................................................27

## Regulations:

8 C.F.R. 1.3(a)(4)(vi) .................................................................................49
8 C.F.R. 101.9(b)(6) ...................................................................................47
8 C.F.R. 274a.12(a) ................................................................................. 8, 26
8 C.F.R. 274a.12(c) ................................................................................. 8, 26
8 C.F.R. 274a.12(c)(14) .........................................................................passim

20 C.F.R. 422.104(a)(2) ..............................................................................49
20 C.F.R. 422.105(a) ..................................................................................49

44 Fed. Reg. 43480 (1979) ..........................................................................47
45 Fed. Reg. 19563 (1980) ..........................................................................47
46 Fed. Reg. 25079-03 .................................................................................47
46 Fed. Reg. 25081 (1981) ............................................................................4

**Legislative Materials:**

H.R. Rep. No. 111-157, 8 (2009) ...................................................6

S. Doc. No. 248, 79th Cong., 2d Sess. 18 (1946) ...........................42

S. Rep. No. 108-176, 108th Cong., 1st Sess. 23-24 (2003) ..............49

**Miscellaneous:**

Nina Bernstein, *Spitzer Grants Illegal Immigrants*
  *Easier Access to Driver's Licenses*, N.Y. Times, Sept. 22, 2007 ...................................30-31

Kenneth Culp Davis & Richard J. Pierce, Jr.,
  *Administrative Law Treatise*, § 6.2 (3d ed. 1994) ...............................................42

DHS, *REAL ID Enforcement in Brief*,
  http://www.dhs.gov/real-id-enforcement-brief .........................................28

*DHS Releases End of Year  Statistics*, http://www.ice.gov/news/releases/dhs-releases-
  end-year-statistics (Dec. 18, 2014)..................................................24

DOJ Report, *United States Attorneys' Written Guidelines*
  *for the Declination of Alleged Violations of Federal Criminal*
  *Laws* 6-9, 22-24 (1979)..................................................................41

Migration Policy Institute, *Deportation and Discretion:*
  *Reviewing the Record and Options for Change* 13, 15 (Oct. 2014).........................24

Texas Dep't of Motor Vehicles,
  *About TxDMV*, http://www.txdmv.gov/about-us   ................................................30

## INTRODUCTION

This case involves a challenge brought by Texas and other States to enjoin—nationwide—enforcement policies that the Secretary of Homeland Security adopted to manage the government's limited immigration enforcement resources and prioritize the removal of aliens who threaten national security or public safety, have committed crimes, or recently crossed the border unlawfully. The challenged policies advance that critical national effort by, among other things, establishing guidelines for deferring action on the removal of other aliens who are not priorities, pose no such threats, and have longstanding and close family ties in the United States. The policies are a quintessential exercise of prosecutorial discretion, an executive function that is not subject to judicial review. And they are an exercise of authority that Congress expressly granted to the Secretary to establish policies for enforcement of the immigration laws, a uniquely federal domain into which States may not intrude. *See Arizona v. United States*, 132 S. Ct. 2492 (2012).

The plaintiff States disagree with the Secretary's exercise of enforcement discretion and have invoked the judicial power to countermand it. But their claims are, at bottom, policy disagreements that must be resolved through the political process; they are not an Article III case or controversy. Indeed, to reach the merits of plaintiffs' claims, the district court was forced to stretch the limits of Article III standing well beyond the breaking point.

That this case involves a policy disagreement and not a true case or controversy

1

is most obvious in the district court's holding that standing may be based on the federal government's supposed "abdication" of its duty to enforce the immigration laws.  Putting aside that it is factually wrong (the federal government has removed more than 2.4 million aliens and substantially increased border security over the past six years, and the new policies will make enforcement more effective), the district court's unprecedented "abdication standing" theory violates Article III's bedrock requirement of a concrete and cognizable injury.  It allows States to sue based on nothing more than their disagreement with how federal officials prioritize their limited resources in light of real-world constraints—the very choices that the Constitution and federal statutes entrust to the Executive.

The district court's only other ground for finding standing—the prospect that Texas may incur additional costs to issue driver's licenses to aliens accorded deferred action who obtain work authorization—is also fundamentally infirm.  Allowing States to manufacture Article III standing on the basis of such incidental and attenuated consequences would allow States to assert a seemingly limitless power to embroil the federal courts in reviewing virtually any exercise of discretion by the federal government.  Moreover, any costs Texas might incur do not constitute a cognizable injury because they would result from the State's own choice to subsidize the cost of licenses rather than requiring applicants to bear the cost themselves, and because such costs would also likely be more than offset by these same policies' expected economic gains to the States.

2

In addition to failing the constitutional test for standing, plaintiffs' claim is precluded by the Administrative Procedure Act (APA) itself. The Supreme Court has held that, by enacting 8 U.S.C. 1252(g), Congress specifically insulated the exercise of enforcement discretion through deferred action from judicial review. That provision is directed most immediately at suits by aliens who are denied deferred action and would be most directly affected by the Secretary's enforcement discretion. But it confirms the broader principle that other individuals and States, who have no direct stake in the Secretary's exercise of enforcement discretion, have no right to challenge grants of deferred action.

The district court's merits determination is equally flawed. The court based its preliminary injunction solely on plaintiffs' claim that the guidelines here needed to go through notice and comment under the APA. But a memorandum that announces guidelines for the exercise of enforcement discretion, and that does not establish rights or impose obligations on the public, is a paradigmatic example of a general statement of policy, which the APA categorically exempts from notice and comment.

To avoid that result, the district court artificially bifurcated the Secretary's policy judgments, acknowledging that the APA does not impose any requirements on the Secretary's discretionary choice of enforcement priorities but claiming that the guidance also conferred "legal presence" and "work authorization" that did trigger notice and comment. That was error. Deferred action does not give an alien any legal right to remain in this country; DHS may revoke deferred action and initiate removal

3

proceedings at any time. And while work authorization may follow from the Secretary's choice of deferred action, an alien's ability to obtain work authorization flows from a decades-old, unchallenged regulation that was itself the product of notice-and-comment rulemaking. Thus, the district court's invocation of the APA's notice-and-comment requirements is without basis.

The preliminary injunction irreparably harms the defendants and the public interest by disrupting the Secretary's comprehensive effort to most effectively marshal the agency's limited resources to protect national security, public safety, and border security, while deferring low-priority removals of aliens that would impose undue humanitarian costs. In contrast, plaintiffs will suffer no cognizable harm if the injunction is lifted.

The court compounded these errors by entering a sweeping nationwide preliminary injunction that restrains the Secretary in plaintiff States not found to have standing and in States not parties to this litigation—a consequence that disrespects the independent sovereign authority of those States, many of which have made the judgment that the Secretary's policies will make their States safer and more economically prosperous. Even if plaintiffs were entitled to injunctive relief, the nationwide breadth of the injunction is indefensible.

## STATEMENT OF JURISDICTION

1. This is a civil action against the federal government that purports to state claims under the APA and the Take Care Clause of the Constitution. Plaintiffs

asserted jurisdiction under 28 U.S.C. 1331 and 28 U.S.C. 1346. ROA.55. For reasons discussed below, plaintiffs lack Article III standing, and the district court therefore lacked jurisdiction.

2.   The district court entered a preliminary injunction on February 16, 2015. The federal government filed a timely notice of appeal on February 23, 2015. The Court has appellate jurisdiction under 28 U.S.C. 1292(a)(1).

## STATEMENT OF THE CASE

### I.   Immigration Enforcement And Prosecutorial Discretion.

This case implicates the unique authority of the federal government to administer and enforce the nation's immigration laws. Whenever Congress vests enforcement authority in an Executive Branch agency, the agency presumptively possesses discretion over the exercise of that authority, "balancing a number of factors which are peculiarly within its expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). That is especially so in immigration, where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). Consistent with this basic feature of the immigration laws, Congress has authorized the Secretary to "establish[] national immigration enforcement policies and priorities," 6 U.S.C. 202(5), and to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority." 8 U.S.C. 1103(a)(3) (emphasis added).

5

Discretion over the removal of aliens is a central aspect of this enforcement discretion. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all," *id*, and "[a]t each stage [of the removal process,] the Executive has discretion to abandon the endeavor." *Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 483-84 (1999). This exercise of discretion may consider numerous factors, including "whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service," and may also involve policy choices that bear on the nation's foreign relations. *Arizona*, 132 S. Ct. at 2499.

Enforcement discretion is essential to the mission of the Department of Homeland Security (DHS) and to the Secretary's authority. Congressional funding decisions have provided DHS with only enough annual resources to remove a few hundred thousand of the estimated 11.3 million undocumented aliens in the United States, as well as recent border crossers and other removable aliens. ROA.97. Recognizing that DHS must decide where to focus its limited resources, Congress has directed DHS to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer," H.R. Rep. No. 111-157, 8 (2009), and to prioritize "the identification and removal of aliens convicted of a crime by the severity of the crime," Department of

Homeland Security Appropriations Act, Pub. L. 114-4, 129 Stat 39, 43 (2015).

Moreover, while Congress has provided that at least $1.6 billion be used to identify

and remove criminal aliens, *see id.*, Congress has not otherwise constrained DHS's

discretion, instead simply providing a lump sum for "necessary" enforcement and

removal efforts. *Id.*; *see Lincoln v. Vigil*, 508 U.S. 182, 191-194 (1993) (allocation of

lump-sum appropriation committed to agency discretion).

One well-established form of discretion over removal is "deferred action." As

a regulation promulgated more than 30 years ago explains, deferred action is an "act

of administrative convenience to the government which gives some cases lower

priority" by deferring removal of an alien for a temporary period. 8 C.F.R.

274a.12(c)(14). The Supreme Court specifically recognized in *AAADC* that the

Executive has long "been engaging in a regular practice (which had come to be known

as 'deferred action') of exercising [its] discretion" not to pursue the removal of aliens

for various reasons, including humanitarian grounds and enforcement prioritization.

525 U.S. at 483-84. Deferred action does not give an alien a legal right to remain in

the United States; DHS may revoke or terminate deferred action and begin removal

proceedings at any time at its discretion. *See* ROA.87.

The Executive Branch has, over several decades, accorded deferred action to

selected members of various groups, including victims of domestic abuse, victims of

human trafficking and other crimes, students affected by Hurricane Katrina, and

certain widows and widowers of U.S. citizens. *See Arpaio v. Obama*, 27 F. Supp. 3d

7

185, 193-94 & nn.2-5 (D.D.C. 2014). Similar forms of discretionary relief from removal have been employed, on an individual and group basis, for an even longer period. *Id.* at 194 & n.7.

Congress has enacted statutes that recognize and rely on the Executive Branch's discretion to defer action regarding the removal of an alien. Congress enacted 8 U.S.C. 1252(g) in 1996 to protect discretionary determinations concerning deferred action from judicial intrusion. *AAADC*, 525 U.S. at 483-85. In 2000, Congress authorized "deferred action and work authorization" for certain undocumented aliens seeking visas under the Violence Against Women Act. 8 U.S.C. 1154(a)(1)(D)(i)(II), (IV). In 2005, Congress provided that States may, but are not required to, issue drivers licenses that will be acceptable identification for certain federal purposes to aliens accorded deferred action. Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 231, 302, 49 U.S.C. 30301 note. And Congress has also provided that certain aliens not otherwise authorized to remain in the United States may be accorded deferred action. *See, e.g.*, *USA PATRIOT Act of 2001*, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361.

Congress has made it unlawful to employ an "unauthorized alien," *see* 8 U.S.C. 1324a(a)(1), but has provided that an alien "authorized to be so employed by the Attorney General" (now the Secretary) is not subject to this prohibition, *id.* § 1324a(h)(3). Regulations adopted in 1981, pursuant to public notice-and-comment rulemaking, provide that aliens who are accorded deferred action may be authorized

8

to work if employment is an economic necessity.  8 C.F.R. 274a.12(c)(14).  Many

other categories of aliens—including aliens without formal immigration status—can

similarly obtain work authorization.  *See id.* §§ 274a.12(a), (c).  Without work

authorization, these aliens would be left to search for employers who would hire them

illegally or to rely on support from family members, friends, or charity.

## II.    Deferred Action For Childhood Arrivals And For Parents Of U.S. Citizens And Lawful Permanent Residents.

**A.**  On June 15, 2012, the Secretary issued a memorandum on the exercise of

enforcement discretion with regard to "young people who were brought to this

country as children and know only this country as a home."  ROA.123.  The Secretary

determined that "additional measures are necessary to ensure that our enforcement

resources are not expended on these low priority cases but are instead appropriately

focused on people who meet our enforcement priorities."  ROA.123.

The 2012 memorandum, the validity of which is not challenged in this case,

established a discretionary enforcement policy referred to as Deferred Action for

Childhood Arrivals, or "DACA."  It provided that immigration officials may,

temporarily and on a case-by-case basis, refrain from pursuing the removal of aliens

who: (1) were under the age of sixteen when they came to the United States; (2) were

present in the United States on the effective date of the memorandum and

continuously resided here for at least the five preceding years; (3) meet certain

educational or military-service criteria; (4) have not been convicted of significant

criminal offenses and do not otherwise threaten public safety or national security; and

(5) are under age 31.  ROA.123.

The Secretary's 2012 memorandum was intended "to set forth policy for the

exercise of discretion within the framework of existing law" and conferred no

substantive rights.  ROA.125.  DHS thus remains free to institute or re-institute

removal proceedings against aliens who have been accorded deferred action under

DACA at any time and at its discretion.

**B.**  On November 20, 2014, the Secretary issued a memorandum revising

DHS's priorities for apprehending, detaining, and removing aliens who threaten

national security, public safety, and border security.  ROA.558-563.  Noting that DHS

lacks sufficient resources to investigate and prosecute every immigration violation, the

memorandum sets forth three levels of priority for removal.  First priority is given to

removal of aliens suspected of engaging in terrorism, espionage, or gang activity;

aliens convicted of serious crimes; and aliens apprehended at the border.  ROA.560.

Second priority is given to removal of aliens who have been convicted of certain

misdemeanors, aliens who unlawfully entered the United States after January 1, 2014,

and aliens who have significantly abused their visas or the visa waiver program.

ROA.560-561.  Finally, third priority is given to removal of aliens who are not

described in Priority 1 or 2, but have been issued a final order of removal on or after

January 1, 2014.  ROA.561.  Other unlawfully present aliens remain subject to

removal, but the memorandum calls for focusing resources on aliens in the priority categories.  ROA.562. Plaintiffs do not challenge this prioritization memorandum.

**C.**  On the same date, the Secretary issued a related memorandum, referred to as the 2014 Deferred Action Guidance, to enhance this removal prioritization effort. ROA.83-87.  The Deferred Action Guidance is the subject of this litigation.

The Guidance announced the Secretary's intention to broaden the class of aliens who may request deferred action under DACA in two respects: first, by removing 2012 DACA's upper limit on age at the time of application, and second, by changing the date by which an individual must have been in the United States from June 15, 2007, to January 1, 2010.  ROA.85-86.  DHS was scheduled to begin accepting requests based on the new DACA threshold eligibility criteria on February 18, 2015.  ROA.86.  The Guidance also increased the length of deferred action under DACA from two to three years, effective November 24, 2014.  ROA.85-86.

In addition, the Guidance announced that DHS would consider according deferred action to certain aliens who are parents of U.S. citizens or lawful permanent residents, a policy known as "DAPA."  To be considered for deferred action under DAPA, an individual must: (1) have, as of November 20, 2014, a son or daughter who is a U.S. citizen or lawful permanent resident; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014, and at the time of making a request for deferred action; (4) have had no lawful immigration status on November 20, 2014; (5)

11

not fall within one of the enforcement priorities established by the Secretary; and (6) "present no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." ROA.86.

As with DACA, a decision to defer action on removal of an alien based on the DAPA policy is to be made on a case-by-case basis. The alien must pass a background check and be individually assessed in light of the Secretary's enforcement guidelines ROA.86-87. If appropriate, deferred action would be accorded for three years, subject to renewal, and could be terminated at any time. ROA.87. As with other aliens who have been accorded deferred action, aliens accorded deferred action under DAPA may be authorized to work provided that they establish economic necessity, *see* 8 C.F.R. 274a.12(c)(14), and pay a processing fee. ROA.87.

Like the 2012 DACA policy, the Guidance does not establish any substantive entitlement to deferred action. ROA.87. Aliens who meet the threshold eligibility criteria may be denied deferred action if other case-specific factors, such as arrests without conviction or involvement in gang activity, indicate that deferred action is inappropriate. ROA.86-87. And deferred action confers no substantive rights. *Id.* DHS can revoke deferred action under DAPA, like DACA, at any time at its discretion.

## III.   District Court Proceedings.

In December 2014, the plaintiff States brought this suit to challenge the Secretary's authority to issue the Deferred Action Guidance. Plaintiffs claimed that

the Guidance: (1) violates the Take Care Clause of the Constitution, art. II, § 3, cl. 5;

(2) fails to comply with the APA's notice-and-comment requirement, 5 U.S.C. 553;

and (3) is arbitrary and capricious under the APA's substantive provisions, *id.* § 706.

ROA.76-78.

On February 16, 2015, two days before DHS was scheduled to begin accepting

requests based on the broadened DACA threshold eligibility criteria, the district court

issued a nationwide preliminary injunction. The injunction prohibits defendants from

implementing "any and all aspects or phases" of DAPA and "any and all aspects or

phases of the expansions (including any and all changes)" to DACA, as outlined in the

2014 Deferred Action Guidance. ROA.4373-4374. The court did not enjoin the

2012 DACA policy, nor did it enjoin DHS from establishing removal priorities. *Id.*

The district court held that "at least one Plaintiff, Texas," would suffer an

injury as a result of the Guidance, for two reasons. ROA.4442. First, the court

concluded that the Guidance would require Texas to incur costs associated with

issuing driver's licenses to aliens accorded deferred action. ROA.4397-4398. Second,

the court concluded that standing could be predicated on a novel "abdication" theory,

which the court described as "a situation when the federal government asserts sole

authority over a certain area of American life and excludes any authority or regulation

by a state; yet subsequently refuses to act in that area." ROA.4432.

On the merits, the court declined to rule on the claims that the Guidance

violates the Take Care Clause and the APA's substantive provisions. ROA.4496-

4497. Instead, the court relied exclusively on the claim that the Guidance should have undergone notice-and-comment rulemaking. ROA.4487. The court rejected the Secretary's position that the Guidance is a general statement of policy, which the APA expressly exempts from notice and comment. *See* 5 U.S.C. 553(b)(A).

The district court concluded that Texas would suffer irreparable harm absent a preliminary injunction because the Guidance would be "virtually irreversible" once implemented, and because Texas would incur unrecoverable costs by issuing driver's licenses. ROA.4490. The court also stated that a nationwide injunction would not harm defendants. ROA.4494. The preliminary injunction applies nationwide, prohibiting implementation of the Guidance not only in Texas, but also in plaintiff States that have not been found to have standing, and in States that are not parties to the suit, including ones that filed an amicus brief identifying harms that the preliminary injunction imposes on them.

## SUMMARY OF ARGUMENT

**1.** In issuing a nationwide injunction on behalf of plaintiff States to countermand the federal government's immigration enforcement discretion, the district court violated fundamental Article III principles.

Third parties lack standing to contest Executive enforcement decisions that are directed at others, and the Supreme Court has specifically ruled that third parties have no cognizable interest in the federal government's enforcement of the immigration laws. This principle carries even greater weight where, as here, plaintiffs are States

and no cognizable injury is shown.  Immigration is a uniquely federal concern, and

Congress has entrusted the enforcement of the immigration laws exclusively to the

federal government.  The district court allowed plaintiffs to enter a domain where our

Constitution's structure denies them the power to act, and, in so doing, embroiled the

judiciary in refereeing a policy disagreement between some (but by no means all)

States and the federal government over how immigration enforcement should be

carried out.

Rather than respect the federal government's exclusive authority over the

enforcement of the immigration laws, the district court relied on the very exclusivity

of that authority as a basis for finding standing to challenge the Executive's exercise

of it.  This unprecedented concept of "abdication standing" is wrong in every respect,

and vividly confirms that this case is a policy disagreement, not a legal dispute.

Factually, the claim of "abdication" is implausible; over the past six years, DHS has

removed 2.4 million aliens and focused substantial additional resources on border

security, and the Guidance will make enforcement *more* effective, not less.  Legally,

"abdication standing" lacks any basis.  It confuses the nature of plaintiffs' legal

claims—that DHS acted unlawfully—with an irreducible requirement of Article III—

that a plaintiff show a cognizable injury.  The Guidance reflects DHS's effort to focus

its limited resources on pursuing aliens who threaten national security, public safety,

and border security, and to avoid expending resources on aliens who do not.  A

State's disagreement with those choices cannot be a cognizable injury sufficient to confer Article III standing.

The only other basis on which the district court found standing—that Texas would incur unreimbursed costs by issuing driver's licenses for aliens accorded deferred action under the 2014 Guidance—also does not establish a cognizable Article III injury. Any attenuated costs Texas bears in issuing driver's licenses are voluntarily assumed and not attributable to the federal government. The Guidance does not require States to issue driver's licenses to aliens who are accorded deferred action, much less require States to subsidize the costs. The court also disregarded the prospect of positive fiscal consequences for the State from the Guidance, including increases in state tax revenues. Most fundamentally, if the incidental and attenuated costs of state services provided to aliens with work authorization were a sufficient basis to enjoin the federal government's immigration policies, a State could attempt to use similar incidental effects to justify a vast interference with countless exercises of federal immigration enforcement discretion, upsetting both the uniquely federal interest in immigration matters and separation-of-powers principles.

**2.** On the merits, the district court erred in holding that the Guidance needed to go through notice and comment. Plaintiffs cannot proceed under the APA because judicial review is impliedly precluded by the Immigration and Nationality Act (INA) and because they fall outside the zone of interests protected by the INA. And even if plaintiffs could bring suit under the APA, the APA's notice-and-comment

requirements expressly exempt general statements of policy.  A general statement of policy "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quotation marks omitted).  That is precisely what the 2014 Guidance does.  It does not have the force and effect of law, it does not bind DHS itself, and, contrary to the district court's view, it does not deprive the agency's officers of discretion in deciding whether to defer the removal of any particular alien.

While purporting to recognize that it lacked authority to review the Secretary's enforcement discretion policies set forth in the Guidance (and in particular that the APA's notice-and-comment requirements did not apply to an agency policy statement setting forth those policies), the district court nevertheless ordered DHS to comply with notice-and-comment procedures based on the theory that the Guidance went beyond enforcement discretion and provided concrete benefits:  the status of "legal presence" and the opportunity for work authorization.  That ruling reflects an artificial and misguided interpretation of the Guidance.   DHS retains unrestricted discretion to seek removal at any time of an alien who has been accorded deferred action.  Nor does the Guidance confer the benefit of work authorization.  It is not the Guidance but a decades-old *regulation* that makes work authorization available to all categories of aliens accorded deferred action.  That regulation was itself promulgated pursuant to notice and comment, thereby satisfying any such requirement the APA might impose.

17

**3.** Because plaintiffs did not show that the Guidance would cause them any cognizable injury, they failed *a fortiori* to show that they are facing irreparable harm.  In contrast, the preliminary injunction causes serious injuries to the federal government, impairing DHS's comprehensive efforts to concentrate its resources on high-priority removals and border security, and disrupting DHS's extensive preparations to implement the Guidance.  The injunction also harms many U.S. citizens and lawful permanent residents and their families; it harms state and local law enforcement agencies whose interests are furthered by increased cooperation from aliens accorded deferred action; and it harms the financial interests of States and localities in increased employment and tax revenues.

**4.** Even if plaintiffs satisfied the requirements for a preliminary injunction, the sweeping nationwide injunction exceeded the proper scope of its equitable authority.  Injunctive relief should be tailored to the parties before the court and should not burden the interests of non-parties—especially non-parties that an injunction would harm.  The district court therefore should have confined any preliminary injunction to Texas, the only State that it found to have standing, or failing that, to the plaintiff States.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy that should only issue if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the

threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (citation omitted). This Court reviews a preliminary injunction for abuse of discretion. *Id.* "Despite this deferential standard," however, "a decision grounded in erroneous legal principles is reviewed *de novo.*" *Id.* Thus, while the district court's findings of fact are subject to clear-error review, "conclusions of law are subject to broad review and will be reversed if incorrect." *Id.*

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE 2014 DEFERRED ACTION GUIDANCE.

To establish Article III standing, a plaintiff bears the burden of demonstrating an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). Where, as here, standing is premised on a claim of an alleged future injury, Article III demands not merely a possibility of injury, but a showing that the injury is "certainly impending." *Id.* at 1148. And the standing inquiry is "especially rigorous" where, as here, a plaintiff asks a court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Plaintiffs fail to satisfy these constitutional requirements.

### A. The States' Attempt to Countermand the Federal Government's Exercise of Immigration Enforcement Discretion Is Not Justiciable.

The decision to prosecute—or to defer prosecution—is a core exercise of Executive power.  Separation-of-powers concerns are therefore at their apex when a court is asked to countermand the Executive's enforcement decisions.  *United States v. Cox,* 342 F.2d 167, 171 (5th Cir. 1965) (en banc).  In particular, the Supreme Court has held that an agency's decision "*not to exercise* its enforcement authority" is presumptively shielded from judicial review.  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  An agency's enforcement strategy "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Id.* at 831-32.  Further, an agency's decision not to exercise enforcement authority "generally does not [involve the] exercise [of] *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect."  *Id.* at 832.  An agency's exercise of enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch."  *Id.*

For these reasons, courts are especially loath to adjudicate controversies between the government and third parties who are not the objects of the enforcement decisions.  The Supreme Court has held squarely that a plaintiff "lacks standing to

contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Similarly, "a plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing." *Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring).

These principles apply with particular force in the realm of immigration. The Supreme Court has held that private persons "have no judicially cognizable interest in procuring enforcement of the immigration laws." *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 897 (1984). Indeed, the Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) (quotation marks omitted)). The Court has made clear that "[t]he obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into" the field of immigration. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). Decisions involving immigration "may implicate our relations with foreign powers." *Mathews v. Diaz,* 426 U.S. 67, 81 (1976). They also must account for "changing political and economic circumstances." *Id.* Because of the need for "flexibility in [immigration] policy choices," such choices are typically "more appropriate to either the Legislature or the Executive than to the Judiciary." *Id.*; *see also New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (immigration enforcement decisions "patently

21

involve policy judgments about resource allocation and enforcement methods [that] fall squarely within a substantive area clearly committed by the Constitution to the political branches").

That States are the plaintiffs here heightens, rather than diminishes, these non-justiciability principles. The "responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches *of the Federal Government*" rather than the States. *Mathews*, 426 U.S. at 81-82 (emphasis added). In its recent decision in *Arizona*, the Supreme Court was emphatic in its recognition that "the removal process is entrusted to the discretion of the Federal Government." 132 S. Ct. at 2506. Under our constitutional structure, States may not interfere with the federal government's ordering of immigration enforcement priorities. *See id.* at 2498 (emphasizing the breadth of "federal power to determine immigration policy"). Thus, more than 15 years ago, this Court dismissed as nonjusticiable Texas's comparable claim that the federal government had "failed to enforce the immigration laws and refuse[d] to pay the costs resulting therefrom." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997). This suit accordingly should have been dismissed at the threshold.

## B.     The District Court's Theory of "Abdication Standing" Is Baseless.

Instead of dismissing the suit, the district court held that plaintiffs, or at least Texas, could proceed on a newly-invented theory of "abdication standing." ROA.4432-4443. The court described "abdication standing" as "a situation when the

federal government asserts sole authority over a certain area of American life and excludes any authority or regulation by a state; yet subsequently refuses to act in that area." ROA.4432. The court held that "a state has standing to bring suit to protect itself and the interests of its citizens" based on the federal government's "refusal to act in a realm where other governmental entities are barred from interfering." ROA.4432. Plaintiffs themselves did not advance this standing theory, and the court conceded that it had found no other case in which a court deemed "abdication," without more, sufficient to support standing. ROA.4442, n.48.

The district court's "abdication standing" theory suffers from two basic defects. First, it fails on the law. It allows States to invoke the judicial power to challenge any exercise of authority by the federal government in the exclusively federal domain of immigration, based on nothing more than a State's disagreement with the federal government's policy priorities and choices about how best to allocate limited resources. As the present case amply illustrates, it invites judicial intervention in policy disputes without anything approaching the kind of concrete and cognizable injury that is an "irreducible" requirement of Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).[1] The district court's abdication reasoning is particularly misconceived because it transforms the well-recognized *bar* to the uninvited exercise of state authority in the field of immigration into a *justification* for allowing a State to

---

[1] Nothing in *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc) (per curiam), supports the "abdication standing" theory. *Adams* does not even address the question of standing.

interfere with federal immigration discretion through the judiciary.

Second, the district court's premise is wrong on the facts. Far from abdicating its authority, DHS is vigorously enforcing the Nation's immigration laws, using the resources that Congress has allocated it. From 2009 through 2014, DHS removed approximately 2.4 million aliens from the United States—an unprecedented number. *See* Migration Policy Institute, *Deportation and Discretion: Reviewing the Record and Options for Change* 13, 15 (Oct. 2014) (DHS removal data for 2009-2013); *DHS Releases End of Year Statistics*, http://www.ice.gov/news/releases/dhs-releases-end-year-statistics (Dec. 18, 2014) (DHS removal data for 2014); *Arizona*, 132 S. Ct. at 2500 ("Hundreds of thousands of aliens are removed by the Federal Government every year."). Moreover, DHS is devoting unprecedented resources to secure the southern border. These resources have contributed to a significant reduction in the number of aliens attempting to enter the country illegally. *See* ROA.928; ROA.4109.

Notwithstanding DHS's aggressive enforcement efforts, approximately 11.3 million undocumented aliens still live in the United States, and many others are newly apprehended at the border each year. Congress, however, has chosen not to incur the immense fiscal and humanitarian cost of removing every removable alien. Instead, Congress has provided DHS with limited enforcement resources and has tasked DHS with making the hard choices about how to prioritize its limited resources as "necessary." *See* 8 U.S.C. 1103(a)(3). Consistent with Congress's direction, DHS has chosen to prioritize removal of aliens who pose national security threats, have

committed serious crimes, and have recently crossed the border illegally.  DHS has

correspondingly chosen to defer removing certain aliens who pose no such danger,

who entered the United States years ago, and whose removal would impose significant

humanitarian costs given their longstanding and close family ties to the country.  This

approach is the polar opposite of "abdication."  It represents responsible immigration

enforcement that advances national security and public safety in the face of real-world

resource constraints.  *Cf. Texas*, 106 F.3d at 667 ("Real or perceived inadequate

enforcement of immigration laws does not constitute a reviewable abdication of

duty").

## C.    Texas's Decision to Subsidize Driver's Licenses Does Not Give It Standing.

The district court's only other ground for finding Article III injury—financial

losses Texas that expects to incur in issuing driver's licenses to aliens accorded

deferred action—is also meritless.  Under the structure of our Constitution, the

incidental and attenuated consequences of an exercise of enforcement discretion by

federal authorities under federal law—especially in an area like immigration that the

Constitution commits to the federal government—are not cognizable injuries that

entitle a third party to invoke the jurisdiction of the federal courts.  In any event,

nothing in the Secretary's Deferred Action Guidance requires States to issue driver's

licenses to aliens who are accorded deferred action or to subsidize the costs.  A State's

choice to incur costs in issuing licenses to aliens accorded deferred action is simply

that—the State's choice.  What is more, the district court failed to take account of the fact that implementation of the Guidance will lead to countervailing fiscal advantages for the States, such as increased tax revenues from aliens who are able to work legally for the first time.

**1.** The district court's driver's-license theory of standing threatens to radically alter the balance between the States and the federal government contemplated by Article III, particularly, but not exclusively, in the realm of immigration enforcement. DHS regulations allow many categories of aliens to obtain work authorization, including lawful permanent residents, asylees, and parolees; aliens who have pending applications for lawful permanent residence, asylum, or parole; and aliens subject to a final order of removal who have been released on supervision.  *See* 8 C.F.R. 274a.12(a), (c).  The district court's theory—that Texas had standing because aliens accorded deferred action could obtain work authorization and thereby qualify for subsidized driver's licenses under Texas law—could thus enable a State to claim standing every time the federal government affords immigration relief to an alien who falls within one of these categories.  Such challenges to federal grants of immigration relief would run flatly contrary to settled law.  *See Arizona*, 132 S. Ct. at 2507.

Furthermore, neither plaintiffs nor the court identified any limiting principle that would confine the district court's conclusion to the realm of immigration.  The court's rationale risks allowing States to second-guess any federal policy that has some downstream effect on States.  Such a theory could invite States to attempt to

26

challenge grants of probation or supervised release for convicted criminals, or federal actions that result in individuals moving from one State to another, or indeed any federal policy that could trigger some service provided by state law.  Article III provides no support for such a boundless theory of standing.

**2.**  The district court's driver's-license standing theory fails even on its own terms, for the Guidance does not require Texas or any other State to issue driver's licenses to aliens accorded deferred action.  The Texas Legislature chose to allow any alien with work authorization to apply for a driver's license.  *See* Tex. Transp. Code 521.142(a), 521.1425(d) (making non-citizens eligible for a license upon presentation of "documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States").  The Supreme Court has made clear that injuries to a State's fisc that "result[] from decisions by [the] state legislature[]" cannot form the basis for Article III standing.  *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).  Furthermore, Texas chooses the price that it charges for driver's licenses.  Texas could decline to subsidize driver's licenses if it believed that the subsidy is not worthwhile.  Texas cannot manufacture an injury by complaining of costs that it controls.[2]  Thus, to the extent Texas suffers any attenuated financial harm from

---

[2] The district court erroneously believed that the REAL ID Act requires plaintiffs to pay a fee of $0.75 per driver's license to the federal government. *See* ROA.4398; ROA.4405-4406.  Participation in the REAL ID Act is not required.  Numerous States—including four plaintiff States—have declined to participate.  *See* DHS, *REAL ID Enforcement in Brief*, http://www.dhs.gov/real-id-enforcement-brief. The States that choose to participate in the REAL ID Act pay a fee to the federal government only

issuing and subsidizing driver's licenses for those accorded deferred action, that

financial harm —at best—amounts to a "self-inflicted injur[y]," which provides no

basis for Article III standing. *Clapper*, 133 S. Ct. at 1152.

The district court mistakenly believed that the Ninth Circuit's decision in

*Arizona DREAM Act Coalition v. Brewer ("ADAC")*, 757 F.3d 1053 (9th Cir. 2014),

compels Texas to provide and subsidize driver's licenses for aliens accorded deferred

action.  But *ADAC* did not even address subsidies or the fees a state may charge for

driver's licenses.  In *ADAC*, the Ninth Circuit preliminarily enjoined, on equal

protection grounds, an Arizona executive order that denied driver's licenses to aliens

accorded deferred action, but allowed driver's licenses to be issued to other aliens that

the court concluded were similarly situated.  *Id.* at 1067.  The court held that the

policy was likely unconstitutional because there was "no rational relationship between

Defendants' policy and a legitimate state interest."  *Id.* at 1065.  A State suffers no

cognizable injury from the application of federal law by complying with a

constitutional mandate to issue driver's licenses rationally under state law. *See Texas*,

106 F.3d at 666 (noting that steps "required by the equal protection clause rather than

by actions of the federal defendants" were not attributable to the federal

---

because of that choice to participate. *See* Pub. L. No. 109-13, div. B, § 202.  And
nothing requires participating States to bear this cost themselves rather than pass it
along to drivers by increasing the fees charged for obtaining a license.

government).[3]

Nor, contrary to the district court's suggestion, do federal preemption principles require States to issue licenses to aliens accorded deferred action. The district court misunderstood the federal government's amicus brief in *ADAC*. The brief explained that federal law preempted Arizona's particular policy of refusing to accept federal employment authorization documents from certain aliens while accepting them from others. *See* ROA.1309-1312. But the government took care to add that "even if a state licensing scheme distinguishes among classes of aliens," federal law nevertheless may permit such a scheme "if the classifications are borrowed from federal law and further a substantial state purpose." ROA.1312.

**3.** The district court's holding that the attenuated financial cost of providing driver's licenses supports Article III standing also disregards the likelihood that implementation of the Guidance will produce positive economic consequences for the States—which is one reason why numerous States have concluded that the Guidance will benefit them and therefore oppose the nationwide injunction. Plaintiffs dismiss these likely consequences as mere "hunches." ROA.1234. It is plaintiffs, however, not defendants, who bear the burden of showing that harm to them is "*certainly*

---

[3] Moreover, even if *ADAC* did require States to issue driver's licenses to aliens accorded deferred action, the district court only made a finding that Texas incurs costs by issuing subsidized driver's licenses, and only two other plaintiff States (Wisconsin and Indiana) attempted to prove that they will incur similar costs. *See* Pls.' Opp. to Stay at 7 n.14. None of those States is in the Ninth Circuit. Thus, regardless of how *ADAC* is read, it does not force any plaintiff to incur costs by subsidizing driver's licenses for aliens accorded deferred action.

impending." *See Clapper,* 133 S. Ct. at 1148.  They have not shown, and the district court did not find, that any costs of issuing driver's licenses will exceed these countervailing advantages.

Most obviously, implementation of the Guidance will likely expand the States' tax bases.  Aliens who receive work authorization will likely earn higher wages and pay more taxes.  *See* ROA.2472-73 (discussing data from previous exercises of deferred action).  In Texas alone, it has been estimated that the 2014 DACA and DAPA policies will produce a $338 million increase in the tax base over five years. *See* ROA.2473.  Further, work authorization will make those accorded deferred action more likely to obtain work-sponsored health insurance, thereby decreasing potential reliance on state-subsidized health care.  ROA.2476.  And allowing parents of U.S. citizens and lawful permanent residents to augment their incomes by working legally will help them better support their children.

Even when viewed in isolation, issuing driver's licenses provides States with many advantages.  People with driver's licenses are more likely to pay vehicle registration fees and produce other revenues associated with car ownership.  Texas itself acknowledges the significance of these revenues.  *See* Texas Dep't of Motor Vehicles, *About TxDMV,* http://www.txdmv.gov/about-us (explaining that for "every $1 the [Texas DMV] spends, it returns more than $10 in state revenue").  Moreover, issuing driver's licenses reduces accidents and lowers insurance costs for other drivers. *See* ROA.2614-2616; Nina Bernstein, *Spitzer Grants Illegal Immigrants*

30

*Easier Access to Driver's Licenses*, N.Y. Times, Sept. 22, 2007 (issuing driver's licenses to undocumented aliens expected to save New York drivers $120 million each year).

The States are wrong to suggest that "the expenditure of money is an injury, no matter when or whether that expenditure is offset." ROA.1233. When the government's enforcement discretion produces incidental costs and benefits, a third party suffers no cognizable injury at all—and a plaintiff surely may not fabricate an Article III injury by cherry-picking the costs and ignoring the benefits. If, for example, the federal government builds a military base in a State, creating thousands of local jobs and millions of dollars in annual tax revenues, the State cannot claim that the government has caused it an injury because the State needs to pay for new traffic lights to handle the increased traffic that results. *Cf. Henderson*, 287 F.3d at 379-80 (use of plaintiffs' tax dollars to produce a challenged license plate "is insufficient to confer standing" in part because motorists who choose the license plate pay additional fees that "offset the administrative costs" of the plates).

### D. Plaintiffs' Other Standing Theories Are Meritless.

The district court properly rejected plaintiffs' argument that the Guidance would impose additional law-enforcement and social-services costs on States by encouraging new immigration to the United States. ROA.4427. Because aliens may not seek deferred action under the Guidance unless they have already been in the country for several years, any increase in immigration would at most be based on a misunderstanding and therefore would not be fairly traceable to the Guidance. And

31

given the numerous other factors that bear on the decision to migrate, the court correctly found that attributing future increases in immigration to the Guidance would be unduly speculative.  ROA.4431.

Nor may the States assert standing on behalf of their citizens under a *parens patriae* theory against the United States.  A "State does not have standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens. *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923).  Nor does *Massachusetts v. EPA*, 549 U.S. 497 (2007), independently authorize the States to litigate on behalf of their citizens.  *Massachusetts* relied on the fact that the State had demonstrated an injury to its own quasi-sovereign interests, 549 U.S. at 522, and the Court further deemed it "of critical importance" that Congress had authorized the exact type of challenge the State brought, *id.* at 516.  Because the States have failed to satisfy the predicate requirement of an injury-in-fact to their own interests, and because no federal statute provides the States a right or cause of action, *Massachusetts* does not apply here.  Indeed, 8 U.S.C. 1252(g) expressly forecloses suits brought by the parties most directly affected by deferred-action decisions: the aliens themselves.  *AAADC*, 525 U.S. at 483-85.

## II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR CLAIM THAT THE DEFERRED ACTION GUIDANCE REQUIRES NOTICE AND COMMENT.

Even if this were a justiciable controversy, plaintiffs would be unlikely to succeed because they have no right to judicial review under the APA, and in any event, the notice-and-comment claim fails on the merits.

### A.    The States Have No Right To Judicial Review Under The APA.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. 702(a). However, this right of action is not available if the relevant statute expressly or impliedly precludes judicial review. 5 U.S.C. 701(a)(1); *see, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-52 (1984). Moreover, even if review is not precluded altogether, a plaintiff has no right to review under § 702(a) unless the interests asserted are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Both of these limitations bar plaintiffs' claims.

The INA does not depart from the general background rules that the exercise of prosecutorial discretion is presumptively unreviewable, *Chaney*, 470 U.S. at 831, and that one cannot "contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.*, 410 U.S. at 619. To

33

the contrary, the INA expressly shields enforcement decisions from judicial review. It declares, with exceptions not relevant here, that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. 1252(g). The Supreme Court has emphasized that the statute adding this provision to the INA was "aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *AAADC*, 525 U.S. at 485-86. And section 1252(g) in particular "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 485 n.9.

Given the traditions against judicial review of enforcement discretion reflected in *Chaney* and *Linda R.S.*, and given that the INA expressly bars challenges to the Secretary's exercise of prosecutorial discretion by aliens directly affected by these exercises of discretion, the absence of any provision affirmatively providing for third parties to bring such suits is a compelling indication that the INA implicitly precludes them. *See Block*, 467 U.S. at 347 (absence from a complex statute of provisions expressly authorizing suits by particular parties is sufficient reason to believe Congress intended to foreclose their right to judicial review).

Moreover, permitting individual States to contest federal immigration enforcement policies would be inconsistent with the INA's overarching purpose of vesting the federal government with exclusive authority to determine whether and

34

when an alien must be removed from the United States. The INA gives expression to this power by vesting the Secretary with exclusive authority to "[e]stablish[] national immigration enforcement policies and priorities," including broad discretion over the decision whether to remove particular aliens. *See* 6 U.S.C. 202(5). The INA does not entitle the States to any role in this process. They are not accorded statutory rights to participate in the formulation of the Secretary's enforcement priorities. They have no right to challenge an enforcement determination. They have no independent power to effect an alien's removal themselves. Indeed, state laws or other state actions that interfere with the federal government's exclusive authority to determine whether an alien should be removed are preempted because they "violate[] the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 132 S. Ct. at 2506.

For all of these reasons, the INA is properly understood to preclude judicial review here. And for much the same reasons, plaintiffs fail the "zone of interests" test, which asks whether Congress intended for a particular plaintiff to be heard to complain of the challenged agency action. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). The statute in question need not be specifically intended to benefit the plaintiff, *Clarke*, 479 U.S. at 399, but when a plaintiff is not itself the object of the challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

Here, nothing in the text, structure, or purposes of the INA suggests that Congress intended to permit States to invoke incidental and attenuated effects of the federal government's immigration enforcement policies in order to contest their procedural or substantive validity. The APA requires a clear showing that Congress intended that "a particular plaintiff should be heard to complain of a particular agency decision." *Clarke*, 479 U.S. at 399. Even assuming that a federal immigration policy had incidental economic consequences for States, that does not mean that Congress, in derogation of the federal government's plenary authority over immigration matters, intended in the INA to give States a role in enforcing the immigration laws or challenging the Secretary's exercise of discretion to administer the statute. *See Texas*, 106 F.3d at 667; *Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996).

## B.    The Deferred Action Guidance Is A Statement Of Policy That Does Not Require Notice and Comment.

The APA generally requires rulemaking to be conducted on the basis of public notice and comment, 5 U.S.C. 553(b), but it expressly exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from this requirement, *id.* § 553(b)(3)(A), thereby confining the notice-and-comment requirement to substantive or legislative rules. The district court's decision reflects a

fundamental misunderstanding of the differences between substantive or legislative rules on the one hand and statements of policy on the other.

1. Substantive or legislative rules have the force and effect of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979). They grant legal rights, impose legal obligations, or otherwise have a significant effect on the legal rights or private interests of third parties. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983). Statements of policy, by contrast, "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quotation marks omitted). They address the agency's internal decision-making and inform the public how the agency intends to exercise its discretion. They do not establish the rights or obligations of third parties. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995).

An agency document such as the 2014 Guidance, which sets forth enforcement priorities and threshold criteria for the agency's allocation of its limited enforcement resources as guidance to its own employees, does not have the force and effect of law and does not establish binding norms of conduct for members of the public. Instead, it "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197, and is consequently exempt from notice and comment.

Thus, for example, in *Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145 (5th Cir. 1984), this Court held that an agency's plan for targeting employers with the highest injury rate for safety inspections was not a legislative rule that needed to be promulgated through notice-and-comment rulemaking. The Court stressed that the agency plan merely set forth a rational means of allocating the agency's inspection resources, without determining the rights or obligations of any of the employers within the agency's regulatory purview. *Id.* at 1155.

Similarly, in *American Hospital Ass'n v. Bowen*, 834 F.3d 1037 (D.C. Cir. 1987), the D.C. Circuit held that notice and comment were not required for a provision of an agency manual that set standards governing when government enforcement agents would review the quality and appropriateness of hospital services billed to Medicare. The court reasoned that the manual provisions established the frequency and focus for enforcement review, so that enforcement agents would "concentrate their limited resources" on areas where further scrutiny was apt to prove most fruitful. *Id.* at 1050; *see also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013, 1017 (9th Cir. 1987) (INS guidelines for deferred enforcement action against immigration-law violators "inform[] the public concerning the agency's future . . . priorities for exercising its discretionary power" and are thus general policy statements exempt from notice-and-comment rulemaking); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1986) (non-binding guidance for exercise of agency's enforcement

discretion not subject to notice-and-comment rulemaking); *Aulenback, Inc. v. FHA*, 103 F.3d 156, 168-69 (D.C. Cir. 1997).

The exercises of enforcement discretion in *Kast* and *Bowen* were characterized by the courts as procedural rules rather than statements of policy. But for purposes of determining whether notice-and-comment rulemaking is required, that is a distinction without a difference, because the APA treats procedural rules and statements of policy identically and distinguishes both of them from substantive and legislative rules. *See* 5 U.S.C. 553(b)(3)(A). The critical question under section 553 is whether a rule establishes new substantive rights or a binding standard of conduct having the force and effect of law with respect to third parties, not whether it should be labeled a procedural rule or a statement of policy. *Prof'ls & Patients*, 56 F.3d at 595. *Kast* and *Bowen* thus apply with full force here.

The district court believed that notice and comment are required whenever internal agency directives constrain the discretion of agency subordinates. As shown below, the Guidance does *not* divest agency officers of discretion. But more fundamentally, the court was mistaken in thinking that limiting the discretion of agency subordinates is, standing alone, sufficient to trigger notice-and-comment requirements. To the contrary, the courts have long recognized that "agency instructions to agency officers are not legislative rules." *Kast*, 744 F.2d at 1152 n.13 (collecting cases).

Constraints on the discretion of agency subordinates are subject to notice and comment only when they also have a direct, coercive impact on regulated parties by establishing binding norms for their future conduct. The court found such a situation in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987). There, an FDA policy announced a new safe harbor freeing regulated parties from the likelihood of enforcement action. The agency admitted it would be effectively estopped from bringing an enforcement action against regulated parties whose primary conduct fell within the safe harbor. *Id.* at 948. The threat of enforcement action outside the safe harbor (coupled with the elimination of any threat within it) had the effect of coercing regulated entities to alter their primary conduct; they could ignore the policy only at their peril. Thus, the court found that, as a practical matter, the establishment of the safe harbor was tantamount to a legislative rule establishing norms for the future conduct of a regulated party. The court accordingly required notice-and-comment rulemaking. *Id.*; *see also Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999) (OSHA mandatory-inspection policy subject to notice-and-comment requirement because it threatened regulated entities with enforcement action if they did not conform to new norms announced by the mandatory-inspection policy); *Am. Trucking Ass'n*, 659 F.2d at 463-64.

Here, by contrast, the 2014 Guidance does not create new norms governing or coercing the conduct of aliens subject to the INA. Questions as to whether the alien entered the country unlawfully or subsequently violated legal limitations on admission

40

or right to remain are governed by the INA and implementing regulations, not the Guidance. The Guidance does not establish norms for an alien's future conduct. Rather, the availability of deferred action under the Guidance depends on actions in the past—such as an alien's date of entry or existing familial relationships—that aliens cannot alter in the future. The Guidance thus establishes no rights or obligations but merely advises the public of how DHS intends to exercise its enforcement discretion.

Agencies often issue policy statements that direct subordinates in allocating limited resources when choosing among the universe of potential violators. For example, U.S. Attorney's Offices have adopted policies against prosecuting low-level violations, such as theft from interstate shipment of property worth less than $500. DOJ Report, *United States Attorneys' Written Guidelines for the Declination of Alleged Violations of Federal Criminal Laws* 6-9, 22-24 (1979); *see* 18 U.S.C. 659. And the Selective Service Agency adopted a "passive enforcement" policy under which it initiated enforcement action only against non-registrants "who report themselves as having violated the law, or who are reported by others." *Wayte v. United States*, 470 U.S. 598, 600 (1985). This policy effectively exempted all but 286 people from a universe of 674,000 estimated violators (99.96%), yet it did not go through notice and comment. *See id.* at 604 & n.3.

Sound policy reasons support Congress's decision to exempt such internal directives from notice-and-comment requirements. DHS may consider exercising prosecutorial discretion in hundreds of thousands of cases each year. The adoption of

41

standardized threshold criteria for use in evaluating whether to exercise enforcement discretion guards against arbitrary, *ad hoc* decision-making by ensuring that each individual decision is consistent with national enforcement priorities established by Congress and the Secretary. The public announcement of such policies also promotes transparency and accountability.  Congress exempted statements of policy from the APA's notice-and-comment requirements precisely to encourage agencies to promulgate such statements.  *See* S. Doc. No. 248, 79th Cong., 2d Sess. 18 (1946) (reprinting 1945 Senate Judiciary Committee print) (the first reason "for the exclusion of rules of organization, procedure, interpretation, and policy" from notice and comment requirements is "to encourage the making of such rules.")   "If agencies are allowed to establish policies that limit their discretion and that of their employees only through the use of the expensive and time-consuming notice and comment procedure, they will rarely choose to limit their discretion at all."  Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise,* § 6.2 (3d ed. 1994).  The district court's approach would ultimately impair these important interests in transparency and public accountability.

    **2.**   The district court further erred in concluding that the Guidance obligates DHS to defer the removal of any aliens who meet the threshold criteria in the Guidance.

    The starting point for determining whether a rule is a statement of policy is the agency's own characterization of its intent and operation.  *Prof'ls & Patients,* 56 F.3d at

596. Here, the guidelines explicitly state that the deferred action policies are to be applied on a case-by-case basis, that they do not establish substantive rights or obligations, and that they create no entitlement to deferred action, even if an alien otherwise meets the guideline's threshold eligibility criteria for deferred action. ROA.84-87.

In practice, the guidelines are inherently discretionary and leave room for individualized case-by-case determinations of whether deferred action is appropriate. They permit broad consideration of anything that indicates an alien "poses a threat to national security or public safety" or any "other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." ROA.86. The fact that the guidelines require such individualized evaluation demonstrates that they are not a legislative or substantive rule subject to notice-and-comment requirements. *Cf. Prof'ls & Patients*, 56 F.3d at 598 (FDA statements that it would take enforcement action against pharmacies engaged in distributing an "inordinate amount" of compounded drugs left room for case-by-case evaluation and did not bind agency's discretion).

The district court reasoned that the high approval rates under the 2012 DACA guidelines (which are not at issue here) indicate that the agency's assertion of discretion under the 2014 Guidance is pretextual. ROA.4483-4484. But the eligibility criteria in the 2014 Guidance had not gone into effect at the time the court issued its preliminary injunction. There is thus *no* record of prior administrative practice under

the guidelines set forth in the 2014 Guidance. The reviewing court cannot disregard official statements of the agency's intent on the basis of mere speculation about the agency's future conduct.

The court's findings in *Arpaio* contradict the district court's perception of how the 2012 DACA guidelines have been implemented. The *Arpaio* court held: (1) that the Secretary retained discretion under the 2012 DACA guidelines to consider each request for deferred action on a case-by-case basis; (2) that decisions were based on a balancing of a number of factors; and (3) that statistics on the approval and denial of deferred action under the 2012 DACA guidelines showed that case-by-case review does occur in practice. 27 F. Supp. 3d 185, 193-94. Record evidence below supports the same conclusion. *See* ROA.4146-4149 (DHS official citing instances where deferred action was not accorded to aliens who met the threshold guideline criteria where the alien was affiliated with a gang, had made false statements in immigration petitions or applications, had a series of arrests but no disqualifying conviction, or was otherwise deemed to pose a threat to public safety).[4]

---

[4] Without providing reasons for discrediting these statements that deferred action could be denied for discretionary reasons, the court simply asserted that these statements did not provide the level of detail that the court requested. *Compare* ROA.4385, *with* ROA.4146-4149. Moreover, contrary to the district court's assertions, ROA.4484, n.99, DHS decision forms *do* provide an opportunity for discretionary denials of deferred action. *See* ROA.1841 (DHS decision form with check-box to indicate that an alien may be denied deferred action because the alien "otherwise do[es] not warrant a favorable exercise of prosecutorial discretion because of national security or public safety concerns").

The district court discounted that evidence because the great majority of 2012 DACA requesters had been accorded deferred action. ROA.4484, n.101. But that is neither surprising nor inconsistent with the existence of agency discretion. The 2012 guidelines, like the 2014 guidelines, establish a process whereby aliens without lawful status can identify themselves to DHS and request that any action on their removal be deferred. The pool of aliens requesting deferred action is thus self-selective, and few can be expected to risk bringing themselves to DHS's attention if prior arrests, gang affiliations, or some other circumstances make them poor candidates for deferred action—especially when the process requires a background check. ROA.86. The court thus erred in ignoring the terms of the 2014 Guidance and concluding that the guidelines mandate deferred action and preclude case-by-case evaluation.

    **3.**   The district court further erred in requiring notice-and-comment rulemaking because the Guidance supposedly establishes a new legal right to remain in the United States. The court focused on language in the Guidance indicating that aliens accorded deferred action are considered to be "lawfully present" for some purposes. But an alien who has been accorded deferred action is "lawfully present" on a temporary basis only in the limited sense that the agency plans not to seek the alien's removal, as an exercise of revocable discretion, for an identified period of time. ROA.84. The alien does not obtain a legal entitlement to remain here. Deferred action "does not confer any form of legal status in this country" and may be revoked or terminated at any time, in the Secretary' sole discretion. ROA.84. Moreover, if

DHS chooses to remove a deferred action recipient, the fact that the alien previously had deferred action provides the alien with no legal defense to removal.

The district court also appears to have assumed that merely being present in the United States is a crime and that deferred action is tantamount to a grant of amnesty that excuses that crime. But while it is a crime to *enter* the United States unlawfully or to *reenter* illegally after having been removed, 8 U.S.C. 1325, 1326, it is not a crime simply to be *present* in the United States after an unlawful entry. *See Arizona*, 132 S. Ct. at 2505. Rather, aliens without lawful immigration status are *removable*. *See* 8 U.S.C. 1227. Deferred action therefore is not a grant of amnesty. Instead, like myriad other exercises of immigration enforcement discretion, it reflects DHS's decision not to expend its limited resources, for a period of time, in bringing removal proceedings against an alien. *See* 8 C.F.R. 274a.12(c)(14). What the district court described as "lawful presence" is nothing more than the inevitable consequence of any exercise of prosecutorial discretion: remaining free of the government's coercive power for so long as the government continues to forebear from exercising that power.

**4.** The district court also erred in concluding that the 2014 Guidance establishes a new right to work lawfully in the United States. Aliens accorded deferred action may be authorized to work if they apply for employment authorization, pay the necessary processing fees, and establish an economic necessity for employment. But that is the result of a 1981 regulation that makes *all* aliens

accorded deferred action eligible to apply for work authorization. 8 C.F.R. 274a.12(c)(14); *see* 46 Fed. Reg. 25079-03, 25081 (May 5, 1981). It is that long-established regulation, not the 2014 Guidance, that permits aliens accorded deferred action to apply for employment authorization. That regulation went through an extended process of notice and public comment before its adoption, in conformity with the APA. *See* 44 Fed. Reg. 43480 (1979); 45 Fed. Reg. 19563 (1980); 46 Fed. Reg. 25079 (1981); 46 Fed. Reg. 25081 (1981) (adding 8 C.F.R. 101.9(b)(6)). When a regulation is issued in compliance with the APA's notice-and-comment requirements, the courts have no authority to require yet another round of notice and comment. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206-07 (2015). The possibility of work authorization is a consequence of DHS's discretionary decision to defer action, not a legal benefit that the Guidance itself confers.

**5.** Finally, the district court was wrong to hold that the 2014 Guidance is subject to notice and comment because it grants aliens new government benefits. *See* ROA.4485-4486. The APA's notice-and-comment requirements do not apply "to the extent there is involved . . . a matter relating to . . . loans, grants, benefits, or contracts." 5 U.S.C. 553(b)(2); *see Baylor Univ. Hosp. Center* v. *Heckler*, 758 F.2d 1052, 1058 n.9 (5th Cir. 1985). Thus, even if the Guidance could be construed to award some affirmative government benefit such as cash or in-kind assistance, the express terms of the APA would exempt it from notice-and-comment rulemaking.

In any event, the guidelines do not award or create eligibility for cash or in-kind assistance, licenses, legal entitlements, governmental services, or any similar benefit. Federal statutes make aliens who are accorded deferred action expressly ineligible for most federal public benefits.[5]  *See* 8 U.S.C. 1611(c), 1641(b) (limiting benefits to "qualified aliens," who are in turn defined as lawful permanent residents, asylees, and other aliens with lawful immigration status).  Federal statutes also make aliens accorded deferred action ineligible for state or local government benefits unless the pertinent State enacts a law specifically providing for their eligibility. 8 U.S.C. 1621; *see also Fla. Bd. of Bar Examiners*, 134 So. 3d 432, 437 (Fla. 2014).  These statutory provisions reflect a national policy that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. 1601.  The Guidance is fully consistent with these statutory limitations.  Indeed, by enabling aliens to obtain work authorization, the Guidance furthers Congress's objectives of ensuring that aliens earn their way, pay taxes, and do not burden the public fisc.

The restriction on eligibility for federal public benefits in 8 U.S.C. 1611 does not bar aliens who are accorded deferred action from receiving social

---

[5]  The statutory bar to alien eligibility for federal benefits does not preclude certain emergency services, regardless of the alien's immigration status.  8 U.S.C. 1611(b)(1). An alien's ability to access these emergency and related services is thus established by existing law and is unaffected by the Guidance.

security retirement benefits, social security disability benefits, or health

insurance under Part A of the Medicare program. 8 U.S.C. 1611(b)(2), (b)(3).

But social security and Medicare both generally require work and payment of

payroll taxes for a substantial period of time before an individual may become

eligible for benefits. *See* 42 U.S.C. 413, 414(a) (Title II social security

retirement); 42 U.S.C. 423(c) (social security disability), 42 U.S.C. 426, 1395c

(Medicare). An alien with work authorization may obtain a Social Security

Number (SSN) and accrue quarters of covered employment toward meeting

these requirements.[6] *See* 20 C.F.R. 422.104(a)(2), 422.105(a); 8 C.F.R.

1.3(a)(4)(vi). And once a valid SSN is obtained, an alien may correct wage

records to add prior covered employment within approximately three years of

the year in which the wages were earned, *see* 42 U.S.C. 405(c)(1)(B), (c)(4), or in

limited circumstances thereafter, *see id.* § 405(c)(5)(A)-(J). But it generally takes

five years (20 quarters) of covered employment to establish eligibility for social

security disability benefits, and ten years (40 quarters) to establish eligibility for

---

[6] Aliens whose social security benefit applications are based on SSNs assigned before January 1, 2004, may count earnings in covered employment before that date toward establishing social security eligibility, regardless of whether that work was lawfully authorized. *See* P.L. 108-203, Title II, § 211, adding 42 U.S.C. 42 U.S.C. 414(c), and amending 42 U.S.C. 423(a)(1)(C), effective January 1, 2004; *see also* S. Rep. No. 108-176, 108th Cong., 1st Sess. 23-24 (2003) (explaining law prior to enactment of P.L. 108-203). Aliens who obtain an SSN that, at the time of assignment, or at any later time, is consistent with work authorization may similarly count all earnings in covered employment credited to that account number, regardless of prior work authorization. *See* 42 U.S.C. 414 (c)(2)(A), 405(c)(2)(B)(i)(I). These rules, however, were established by existing law, not the Guidance.

49

social security retirement benefits and most Medicare Part A coverage—far longer than the three-year period of deferred action set forth in the 2014 Guidance. The immediate effect of deferred action and employment authorization is not to render aliens eligible for receipt of Medicare or social security payments, but rather to facilitate their payment of payroll taxes into the funds that support current retirees and Medicare beneficiaries.

## III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH STRONGLY AGAINST THE PRELIMINARY INJUNCTION.

**A.** A preliminary injunction cannot be based on a mere "possibility" of irreparable harm to the plaintiff. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Rather, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* Here, because plaintiffs have failed to establish that they will suffer *any* cognizable injury, they have necessarily failed to show that they will suffer an irreparable harm. *Accord Arpaio*, 27 F. Supp. 3d at 208 (noting that "the same problem that confronts the plaintiff's standing argument . . . likewise dooms the plaintiff's ability to show irreparable harm").

The district court rejected the States' assertion that they would suffer irreparable harm due to a "wave" of illegal immigration, correctly pointing out that such alleged harm was not "immediate, direct, or a presently-existing, actual threat." ROA.4489. But the court accepted plaintiffs' claim that the 2014 Guidance would cause irreparable harm because it would be "virtually irreversible" once implemented.

ROA.4490. The court reasoned that Texas, and perhaps other States, would expend resources issuing and subsidizing driver's licenses for deferred action recipients, and that they would face "the substantially difficult—if not impossible—task of retracting any benefits or licenses" if the Guidance were later invalidated. ROA.4491.

Neither premise is correct. For reasons explained above, nothing about the 2014 Guidance requires States to issue driver's licenses to aliens accorded deferred action, much less to subsidize the costs involved. To the extent that States choose to subsidize licenses, any such attenuated financial cost to the State is not fairly attributable to the Guidance. And even if States were required to issue subsidized licenses to aliens accorded deferred action, the States have failed to show that these costs outweigh the positive economic consequences for the States of according deferred action. Nor would the Guidance be "virtually irreversible" once implemented. To the contrary, deferred action "may be terminated at any time at the agency's discretion." ROA.84.

**B.** Plaintiffs bear the burden of proving both that "the threatened harm to [their interests] will outweigh any potential injury the injunction may cause the opposing party" and that "the injunction, if issued, will not be adverse to public interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F. 2d 1074, 1079 (5th Cir. 1986). These two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the harm to the federal government and to the public interest caused by the preliminary injunction far exceeds the injury claimed by

51

plaintiffs.

The preliminary injunction obstructs a core Executive prerogative and prevents the Secretary from establishing and effectuating his "policies and priorities" to enforce the Nation's immigration laws. *See* 6 U.S.C. 202(5). The court's order thus offends basic separation-of-powers principles, impinging on Executive functions in the complex and sensitive field of immigration enforcement. Moreover, an injunction issued at the behest of plaintiff States that lack any authority over the Nation's immigration policies directly contravenes the allocation of powers between the federal and state governments. In light of these structural injuries, the preliminary injunction harms the federal government in an ongoing manner that cannot be undone if and when the Guidance is upheld.

The injunction prevents DHS from most effectively allocating its resources regarding removal of aliens to support its paramount mission to protect the Homeland and secure our borders. The 2014 Guidance is an integral part of the Secretary's efforts to prioritize the removal of aliens who most threaten national security, public safety, and border security. It is no answer to say, as the district court did, that the injunction does not prohibit the Secretary from setting enforcement priorities. The Guidance facilitates the implementation of those priorities. Instead of spending valuable resources determining whether encountered individuals should be prioritized for removal, DHS can rely on deferred action documentation to quickly determine that they should not be. As the highest-ranking official for U.S.

Immigration and Customs Enforcement explained, the injunction thus "interferes with the Federal Government's comprehensive strategy for enforcing our immigration laws." ROA.4540; *see also Arpaio*, 27 F. Supp. 3d at 210-11 ("Halting these deferred action programs would inhibit the ability of DHS to focus on its statutorily proscribed enforcement priorities (national security, border security, and public safety)").

Furthermore, the injunction creates certain intractable administrative burdens for DHS and jeopardizes the ultimate success of the Secretary's policies. To effectively implement the Guidance, DHS must have the necessary infrastructure in place before the first requests are submitted. DHS had already leased space, initiated the hiring process for employees, and taken other preparatory steps to implement the Guidance before the injunction issued. ROA.4451, n.55. Forcing the agency to cease these efforts midstream imposed significant administrative burdens on DHS, and enjoining such efforts for a prolonged period of time will cause greater and longer-lasting harm in the future. The preliminary injunction thus does not merely preserve the status quo, but instead compromises substantial preparatory work that DHS had already undertaken. *Cf. Ruiz v. Estelle*, 650 F.2d 555, 571 (5th Cir. 1981) (granting stay to relieve state agency of "burden . . . in terms of time, expense, and administrative red tape" of complying with order).

The preliminary injunction imposes burdens that extend far beyond the federal government. The Guidance is expected to improve public safety by encouraging aliens accorded deferred action—who might otherwise fear coming forward—to

cooperate with state and local law enforcement officers. *See* ROA.4546 (declaration of Commissioner of U.S. Customs and Border Protection); ROA.2613-2615 (amicus brief of Major Cities Chiefs Association, *et al.*). The injunction deprives local law enforcement and city governments of this significant (and undisputed) benefit. The injunction likewise injures state and local governments by depriving them of the significant tax revenues that they would obtain as a result of the Guidance. And the injunction imposes humanitarian burdens on many families of U.S. citizens and lawful permanent residents by depriving family members of the prospect of discretionary relief.

## IV.   THE DISTRICT COURT'S NATIONWIDE INJUNCTION IS IN ANY EVENT OVERBROAD.

The district court's injunction is drastically overbroad and thus is invalid even if some injunction were warranted. Twenty-four States, the District of Columbia, and the U.S. territories are not parties to this action, and a dozen States participated as *amici* below to oppose plaintiffs' challenge and demonstrate the adverse effects of the district court's injunction. Yet the district court enjoined the Guidance on a nationwide basis, barring implementation in States that do not oppose the policies set forth in the Guidance and even in States that actively support them.

In these circumstances, a nationwide injunction is a manifest abuse of discretion. An injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S.

682, 702 (1979); *Lion Health Servs., Inc. v. Sebelius*, 635 F3d 693, 703 (5th Cir. 2011); *see also Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (staying nationwide injunction insofar as it "grants relief to persons other than" named plaintiff). It must also take account of "the larger interests of society that might be adversely affected by an overly broad injunction." *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1006 (5th Cir. 1981). The APA's provisions regarding preliminary injunctions incorporate these principles. *See* 5 U.S.C. 705 ("*to the extent necessary to prevent irreparable injury*," reviewing court "*may* issue" orders to "preserve status or rights pending conclusion of the review proceedings") (emphasis added). These principles apply with greater force where, as here, the scope of the relief harms non-parties.

The injunction here is far broader than necessary to redress any purported injury to the plaintiff States. The district court identified only a single, specific injury to any of the plaintiffs: costs Texas expects to incur in processing and subsidizing driver's license applications from aliens accorded deferred action. ROA.4397-4398; ROA.4412. Only two other plaintiff States (Indiana and Wisconsin) specifically alleged that they would incur similar costs. *See* Pls.' Opp. to Stay at 7 n.14. There is no basis for assuming that the other plaintiff States incur the same net cost as Texas, especially when twenty-three plaintiffs submitted no evidence on this issue and when every State is free to charge license fees that cover its costs.

Speculation that Texas *might* incur additional net costs issuing driver's licenses—and that those costs *might* not be offset—does not empower the district

court even to hear this litigation, much less to enjoin the implementation of the 2014 Guidance nationwide. Likewise, the hypothetical and even more attenuated possibility that an alien accorded deferred action in another State might move to Texas and apply for a driver's license does not justify barring implementation in all fifty States to accommodate one. Absent a finding that any State other than Texas would suffer any identifiable financial injury, the scope of the injunction should be confined to Texas. Failing that, the injunction should not extend beyond the plaintiff States.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed.  In the alternative, the injunction should be reversed to the extent that it extends to States other than Texas or, at a minimum, as to non-plaintiff States.

<div style="margin-left:40%">

Respectfully submitted,

BENJAMIN C. MIZER
  Acting Assistant Attorney General

KENNETH MAGIDSON
  United States Attorney

BETH S. BRINKMANN
  Deputy Assistant Attorney General

DOUGLAS N. LETTER
SCOTT R. McINTOSH
JEFFREY CLAIR
WILLIAM  E. HAVEMANN
  (202) 514-4052
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C. 20530-0001

</div>

**FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE**

I certify that this brief has been prepared in Microsoft Word using a 14-point, proportionally spaced font, and that based on word processing software, the brief contains 13,901 words.

/s/ *William E. Havemann*
WILLIAM E. HAVEMANN
William.E.Havemann@usdoj.gov
(202) 514-8877

## CERTIFICATE OF SERVICE

I certify that on March 30, 2015, I electronically filed the foregoing Brief for the Defendants-Appellant using the Court's CM/ECF system, which constitutes service under the Court's rules.

/s/ *William E. Havemann*
WILLIAM E. HAVEMANN
William.E.Havemann@usdoj.gov
(202) 514-8877