

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW, Rm. 7243
Washington, DC 20530

BSB:DNL:SRMcIntosh

Tel:  (202) 514-4052

April 14, 2015

Hon. Lyle W. Cayce
Clerk of the Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

    Re:  <u>Texas v. United States, No. 15-40238</u>

Dear Mr. Cayce:

    Oral argument on appellants' motion for a stay pending appeal is scheduled for April 17.  Pursuant to FRAP 28(j), appellants respectfully submit the district court's April 7, 2015, opinion and order, denying a stay.  The following points warrant comment:

- None of the cases the court cites (Op. 7) suggests plaintiffs may pursue an "abdication" claim without showing an Article III injury.

- Deferred action and work authorization do not confer tax credits or Social Security benefits (Op. 10).  Work authorization removes one legal barrier, but aliens must satisfy independent statutory requirements as well to qualify for them.

- There is no inconsistency (Op. 11-12) with the interest in uniform federal immigration policies.  The government seeks a stay of the entire preliminary injunction, and requests a limited stay only if that broader request is denied, because partial implementation is preferable to supplanting federal policy altogether.

- If aliens received only "documentation designating [them] as low-priority targets" (Op. 13), they would have little incentive to identify themselves to DHS, undermining deferred action's ability to help target enforcement resources (Stay Motion 17).

- The district court misconstrued the President's remarks (Op. 4-5), which do not suggest that the policies divest officers of case-by-case discretion.  As this

2

Court's decision in *Crane* recognizes, the opposite is true. The remarks reflect only that immigration officers, like all federal employees, are required to comply with their agency's policies.  Moreover, when read in full, the President's general remarks about immigration enforcement priorities – in which he recognized implementation of the 2014 Deferred Action Guidance had been enjoined and stated that the government would "prioritize who it is we're really focused on" for removal – do not support the court's conclusions.

- The district court's suggestion that the federal government misled it regarding implementation of the 2014 Deferred Action Guidance (Op. 1-2) by way of grants of three-year rather than two-year deferred action to individuals under the 2012 DACA criteria is incorrect and unwarranted.  In any event, the court identified no respect in which that issue affected the merits of the preliminary injunction (see Op. 2 n.4).

Thank you for providing this letter to the panel.

                      Respectfully submitted,

                      /s/ Scott R. McIntosh
                      Attorney, Appellate Staff
                      Civil Division
                      U.S. Department of Justice
                      scott.mcintosh@usdoj.gov

enc

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL., | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL NO. B-14-254 |
| | § | |
| UNITED STATES OF AMERICA, ET AL., | § | |
| Defendants. | § | |

# MEMORANDUM OPINION AND ORDER

On February 23, 2015, the Defendants, including the United States and various officials of the Department of Homeland Security ("DHS") (hereinafter the "Government" or "Defendants"), filed an Emergency Expedited Motion to Stay this Court's February 16, 2015 Order of Temporary Injunction [Doc. No. 150] concerning the DAPA[1] program (and the 2014 amendments to the DACA[2] program) established by the November 20, 2014 Memorandum issued by DHS Secretary Jeh Johnson (hereinafter the "2014 DHS Directive" or "Directive"). The Government supplemented its motion on March 12, 2015 [Doc. No. 195]. Just prior to filing its Motion to Stay, the Government filed a Notice of Appeal to the Fifth Circuit Court of Appeals [Doc. No. 149]. The Plaintiff States[3] (hereinafter the "Plaintiffs" or "States") responded to the Government's Motion to Stay on March 3, 2015 [Doc. No. 175].

The States have also filed a Motion for Early Discovery [Doc. No. 183]. In their discovery motion, Plaintiffs complain that the Government misled them and the Court by making

---

[1] "DAPA" is the acronym for Deferred Action for Parents of Americans and Lawful Permanent Residents.

[2] "DACA" is the acronym for Deferred Action for Childhood Arrivals.

[3] The Plaintiffs include: the State of Texas; State of Alabama; State of Arizona; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of Nevada; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Utah; State of West Virginia; State of Wisconsin; Attorney General Bill Schuette, People of Michigan; Governor Phil Bryant, State of Mississippi; Governor Paul R. LePage, State of Maine; Governor Patrick L. McCrory, State of North Carolina; and Governor C. L. "Butch" Otter, State of Idaho.

certain representations concerning when and how parts of the 2014 DHS Directive would be implemented. The Court finds that the Government's multiple statements on this subject were indeed misleading, as detailed in the Order filed simultaneously with this Order. It also finds that the remedial measure taken by counsel for the Government through the filing of an "advisory" on March 3, 2015, was neither prompt nor fully candid. Despite this, a sanction as severe as striking the Government's pleadings, while perhaps merited based upon the Government's misconduct, would not at this juncture be in the interests of justice or in the best interest of this country. The issues contested in this case are of national importance, and the outcome will affect millions of individuals. The parties' arguments should be decided on their relative merits according to the law, not clouded by outside allegations that may or may not bear on the ultimate issues in this lawsuit. Consequently, while this Court may impose some other sanction in response to the misrepresentations made to the Court, it will not strike the Government's pleadings.[4] The Court now turns to the merits of the Government's Motion to Stay—the focus of this Order.

In its Motion, the Government has essentially asked this Court to reconsider its decision to issue a preliminary injunction. The Court has reviewed the Government's Motion and Supplemental Motion, as well as the States' response. The Court also held a hearing on March 19, 2015, at which these issues were discussed. Having considered the positions of all parties and the applicable law, this Court remains convinced that its original findings and rulings in the Order of Temporary Injunction and Memorandum Opinion and Order issued on February 16,

---

[4] While it remains to be seen what substantive effect, if any, this conduct has had on this case, it has clearly delayed the Court from being able to rule on the merits of the Motion to Stay. If it is later proven that the Government's lack of candor substantively affected this Court's ruling on the temporary injunction (or the current appeal thereof), or that it will somehow affect the eventual resolution of the merits of this case, or if the Government either directly or indirectly violates this Court's injunction, the Court will revisit the propriety of striking the Government's pleadings.

2

2015 (hereinafter referred to jointly as the "February Opinion") were correct. In fact, for many of the reasons stated below, the decisions reached previously by this Court have been reinforced.

I. **Standing**

The Government reasserts its claim that the States do not have standing. For the most part, it presents the same arguments that this Court has already considered and addressed at length. Consequently, the Court will not repeat its analysis on those points. Instead, it will concentrate on aspects that are either new or that were not necessarily emphasized during the prior hearing.

Specifically, the Government argues that because this Court's findings on standing focused on Texas' injury, operation of the 2014 DHS Directive should not be enjoined as to other states, including the other Plaintiff States, because no specific findings were made as to their injuries. For the same reason, the Government also objects to the breadth of the injunction—an argument the Court will address below.[5]

As confirmed by the Supreme Court's opinion in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Court need only find standing for one plaintiff in order for it to conclude that it has jurisdiction to hear the case. In *Massachusetts v. EPA*, multiple states (including California, Connecticut, Illinois, Maine, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington) and other entities filed suit to compel action by the Environmental Protection Agency, alleging that the federal agency was failing to enforce the law and had "abdicated its responsibility under the Clean Air Act" to regulate certain emissions. *Id.*

---

[5] As an initial matter, the Court notes that, given the emergent nature of this temporary injunction, the Court, as well as counsel for both sides, operated on a short schedule—a timeframe in essence set by the Government based upon its projected dates for implementation of the 2014 DHS Directive. At the preliminary injunction stage of the proceedings, there is no requirement for each and every plaintiff to produce sufficient evidence of any injury allegedly caused by Defendants' actions, as long as at least one plaintiff has standing. *See infra* note 10. All of the Plaintiffs may very well have been able to show standing individually based upon a direct damage or abdication claim if they had been given time to make such a presentation.

at 505.  The Government in that case objected to the plaintiffs' standing to bring the suit, just as the Government has in the present case.

The Supreme Court, noting its obligation to address standing before proceeding to the merits, stated in pertinent part:

> In response, EPA, supported by 10 intervening States and six trade associations, correctly argued that we may not address those two questions [dealing with the merits] unless <u>at least one petitioner has standing</u> to invoke our jurisdiction under Article III of the Constitution.

*Id.* (emphasis added).  Ultimately, the Supreme Court found that it had jurisdiction by virtue of a single state, Massachusetts, just as this Court found that it has jurisdiction by virtue of a single state, Texas.  Writing for the majority, Justice Stevens concluded:

> Only one of the petitioners needs to have standing to permit us to consider the petition for review.  *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

*Id.* at 518.

Thus, the Government has already fought this battle once in the Supreme Court and lost.  Following the dictates of the Supreme Court in *Massachusetts*, there is at least one plaintiff in this case that has established it will be directly damaged by the 2014 DHS Directive and that it has standing.  This Court therefore has jurisdiction to hear the case.  Consequently, the Court denies the Government's requested relief based upon that ground.

Second, with regard to the February Opinion's discussion of standing by virtue of abdication,[6] recent actions taken by the Government confirm that it has abdicated enforcement of the applicable portions of the Immigration and Naturalization Act ("INA").  During a "Town Hall" meeting on immigration, held after this Court granted the preliminary injunction, the

---

[6] The Court notes that because it found Texas would suffer direct damages, abdication was not the only basis upon which standing was found.

4

President discussed the recent changes implemented at his direction. In response to a question from an individual upset over a deportation action, the President said:

> **THE PRESIDENT:** I would have to know the details of what exactly happened. But what I can tell you is that until we pass a law through Congress, the executive actions that we've taken are not going to be permanent; they're temporary.
>
> We are now implementing a new prioritization. <u>There are going to be some jurisdictions, and there may be individual ICE officials or Border Patrol who aren't paying attention to our new directives. But they're going to be answerable to the head of the Department of Homeland Security, because he's been very clear about what our priorities should be. And I've been very clear about what our priorities should be.</u>
>
> \* \* \*
>
> **MR. DIAZ-BALART [the moderator]:** But what are the consequences? <u>Because how do you ensure that ICE agents or Border Patrol won't be deporting people like this?</u> I mean, what are the consequences?
>
> **THE PRESIDENT:** <u>José, look, the bottom line is, is that if somebody is working for ICE and there is a policy and they don't follow the policy, there are going to be consequences to it.</u> So I can't speak to a specific problem. What I can talk about is what's true in the government, generally.
>
> In the U.S. military, when you get an order, you're expected to follow it. It doesn't mean that everybody follows the order. <u>If they don't, they've got a problem. And the same is going to be true with respect to the policies that we're putting forward.</u>

Press Release, Remarks by the President in Immigration Town Hall—Miami, FL, The White House Office of the Press Secretary (Feb. 25, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/02/25/remarks-president-immigration-town-hall-miami-fl (emphasis added).[7]

The President's message, specifically to those law enforcement officials employed within the Executive Branch, and more generally to the nation, is clear. First, immigration laws (i.e. the

---

[7] Counsel for the Government assured the Court that it could trust and rely upon the President's statements. [Hr'g Tr. 22, Mar. 19, 2015].

INA), which those officials are charged with enforcing, are not to be enforced when those laws conflict with the 2014 DHS Directive. Second, the criteria set out in that Directive are mandatory. Third, if DHS officials (or other Executive Branch officials) fail to follow the specified criteria, there will be consequences for this failure―just as there would be consequences if they were in the military and disobeyed an order from the Commander in Chief. In summary, the Chief Executive has ordered that the laws requiring removal of illegal immigrants that conflict with the 2014 DHS Directive are not to be enforced, and that anyone who attempts to do so will be punished.

This is not merely ineffective enforcement. This is total non-enforcement, applicable to millions of people. If one limits the directive just to putative DAPA recipients, this is an order by the President to *not* enforce the law as to approximately 4.5 million people—the rough equivalent of the population of the State of Louisiana, and a population larger than the populations of 25 of the 50 states.[8] In fact, thirteen of the 26 Plaintiff States have populations that are less than the number of illegal immigrants estimated to receive the benefits accompanying "legal presence" under the 2014 DHS Directive.[9]

---

[8] U.S. Census Bureau, Population Distribution & Change: 2000 to 2010 (2010 Census Briefs) (issued March 2011), *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf (hereinafter "U.S. Census Bureau"). The State of Louisiana is the 25th most populous state, with a population of 4,492,076 according to the 2010 U.S. Census. *Id.*

[9] Further, while DAPA applies to an estimated 4.3 to 5 million illegal immigrants, the White House has also announced that, "the way the change in the law works is that we're reprioritizing how we enforce our immigration laws generally. So not everybody qualifies for being able to sign up and register, but the change in priorities applies to everybody." Press Release, Remarks by the President on Immigration―Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014) (emphasis added). Therefore, according to the President, the law requiring removal is also not going to be enforced (subject to limited exceptions) against any of the remaining estimated 6–7 million illegal immigrants who may apply under the 2014 DHS Directive, but are rejected. As such, the President's order not to enforce the INA could potentially affect a total population greater than the populations of 43 states (depending on which population study one uses to estimate the illegal immigrant population and how many immigrants apply for DAPA). *See* U.S. Census Bureau.

Support for this conclusion is found not only in the President's remarks, but also in the manner in which DACA has been implemented. The evidence presented led this Court in its February Opinion to conclude that DAPA will be enforced like DACA. Moreover, attorneys for both sides have recommended that the Court use the DACA

The President's statements have obvious significance to this case. Both the Fifth Circuit and the United States Supreme Court have stated that a plaintiff, including a state, has standing to pursue an action when the Government is abdicating its statutory duties, and that such abdication is judicially reviewable. *See Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)); *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (noting that a conscious decision to abdicate immigration enforcement responsibilities would be reviewable).[10] The facts underlying this case indisputably represent abdication. This Court so found. The President's recent statements serve as confirmation for that finding.

## II.   Application Of The Administrative Procedure Act

The Government also asks this Court to review its ruling concerning the applicability of the Administrative Procedure Act (hereinafter the "APA"). Here, too, the President's explanation of the 2014 DHS Directive is important. First, it corroborates the Court's finding that the employees charged with implementing this new program are without discretion. The criteria under DAPA (and the DACA amendments) pursuant to the Directive are fixed and are binding on DHS employees. Those employees who attempt to exercise discretion by varying from the Directive and the criteria set forth therein will suffer consequences, according to the President.

---

experience as a guideline. [*See, e.g.*, P.I. Hr'g Tr. 90–91, 107, Jan. 15, 2015; Doc. No. 38 at 30 (Def. Resp. Brief)]. In fact, counsel for the Government specifically referred this Court to the DHS' publication of "Frequently Asked [DACA] Questions" to evaluate how DAPA will be implemented. [P.I. Hr'g Tr. 107]. That publication indicates that pursuant to DACA, even non-qualifying illegal immigrants are not deported. *See* Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions#afterUSCISmakesadecision (last reviewed/updated Mar. 10, 2015). Using this publication as an indication of how DAPA will work, as was suggested by counsel for the Government, one cannot avoid drawing the conclusion that those who are rejected for DAPA will likewise not be deported.

[10] This concept alone arguably establishes standing for all of the States, not just Texas. The Court need not explore that argument though because, as stated above, only one State needs standing for the Court to hear the case.

The President's statement also confirms this Court's finding that the 2014 DHS Directive is not a "general statement of policy," or mere "general guidance" to DHS employees, but is, rather, a mandatory directive that is easily characterized as a substantive rule under the APA. As this Court has noted, and all parties concede, a "legislative" or "substantive" rule is one that requires vetting under the process established by the APA. The following are the hallmarks of a substantive rule―any one of which would alone be sufficient to make a rule substantive―as summarized from the pertinent case law:

> **1. A rule that narrowly constricts the discretion of agency officials is a substantive rule (as opposed to a general statement of policy that does not establish a binding norm and "genuinely" leaves officials free to exercise discretion).[11]**

If there were any doubts that the 2014 DHS Directive is correctly characterized as "substantive," the President's warning to DHS employees of adverse consequences for failing to follow the Directive should clearly extinguish those. The criteria under the 2014 DHS Directive unquestionably "narrowly constrict[] the discretion of agency officials by largely determining the issue addressed." *Shalala*, 56 F.3d at 595 n.20. Those with boots on the ground are bound to follow the Directive's criteria, and the President takes it even further by positively stating that those who do not follow the Directive will suffer consequences. Other than the Directive's facial claim that it permits case-by-case determinations (which the Court has already found disingenuous and contrary to what was occurring in practice), the "challenged policy [does not] leave[] the agency free to exercise its discretion to follow or not follow that general policy in an individual case"; instead, "the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criteria." *Id.* at 596; *see also*

---

[11] *See, e.g.*, *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987); *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 n.20, 600–01 (5th Cir. 1995).

*Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) ("The label that the particular agency puts upon its given exercise of administrative power is not . . . conclusive; rather, it is what the agency does in fact.") (citations omitted). The Court previously found this factually, and the President's statements reinforce both the Court's factual findings and legal conclusions.

> **2. A rule is substantive/legislative if it adopts a new position inconsistent with existing law or otherwise effects a substantive change in existing law or policy.[12]**

If there were any claim that the 2014 DHS Directive does not adopt a new position inconsistent with the INA, the President's comments also lay that argument to rest. Instead of removing individuals who are violating the INA, the new program rewards them with legal presence and a whole host of benefits. Yet, while the law-breaker is rewarded, any officer or agent who attempts to enforce the law as enacted will be made to suffer the consequences. This is a sea-change under anyone's definition: the law-breaker receives a myriad of benefits and the law enforcement officer suffers adverse ramifications.

The 2014 DHS Directive is both contrary to existing immigration legislation and an unprecedented executive action by even the agency's own account. [*See* Doc. No. 38, Def. Ex. 2 at 30 (the Executive's Office of Legal Counsel conceded that the program was unprecedented in terms of size)]. The President said as much when he announced to the nation that he "took an action to change the law." Press Release, Remarks by the President on Immigration―Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014).

---

[12] *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

### 3. Agency actions that confer benefits not otherwise provided for in existing law are "legislative."[13]

This Court has previously described in detail the benefits, in addition to three years of renewable legal presence, that the DAPA program awards its recipients. There is no need to repeat those here. Nevertheless, the Court notes that in the weeks surrounding this Court's February Opinion, the IRS Commissioner confirmed under oath that DAPA recipients would be eligible for tax benefits. Recent Congressional testimony confirms that DAPA recipients would additionally be awarded Social Security benefits.[14] To give removable immigrants these benefits is certainly a new policy, which, at the very least, should be afforded notice and comment under the APA. *See, e.g.*, *Am. Mining Congress*, 995 F.2d at 1112 (providing as one factor, which may alone make a rule substantive, "whether in the absence of the rule there would not be an adequate legislative basis for . . . agency action to confer benefits"). The Government has acknowledged that its strategy with DAPA is to provide certain benefits as an incentive for individuals to apply for DAPA. [Hr'g Tr. 30, Mar. 19, 2015]. It also confirmed, through counsel, that offering these incentives is not an act of prosecutorial discretion: "I think an incentive for this pro - - the reason why deferred action in the department's judgment <u>works in a way that's different than the</u>

---

[13] *See Scenic America, Inc. v. U.S. Dept. of Transp.*, ___ F. Supp. 3d ___, 2014 WL2803084, at *5 (D.D.C. June 20, 2014); *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110, 1112 (D.C. Cir. 1993).

[14] Again, awarding income tax credits to illegal immigrants is not only a tangible benefit, but it is also a substantive change in the law. The Plaintiff States had argued that DAPA recipients would receive Social Security benefits as well as Social Security cards (and no one suggested that the States were incorrect). However, prior to its February Opinion, this Court was not provided with cogent evidence supporting that assertion. After the Court's February Opinion, experts testified before Congress that DAPA recipients will receive both tax and Social Security benefits. *See The Fiscal Costs of the President's Executive Actions on Immigration, Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. (Mar. 17, 2015) (statements of Robert Rector, Senior Research Fellow, the Heritage Foundation; Eileen J. O'Connor, Esq., Partner, Pillsbury Winthrop Shaw Pittman LLP, previous Assistant Attorney Gen., Tax Div. of DOJ; Steven A. Camarota, PhD, Director of Research, Center for Immigration Studies). One expert's testimony included the opinion that the lifetime costs of Social Security and Medicare benefits to DAPA recipients are likely to exceed one trillion dollars. *See id.* (statement of Robert Rector). This Court does not have a record before it by which to quantify this benefit or analyze such testimony, but, if true, whether it is one dollar or a trillion dollars, it represents an award of a benefit heretofore contrary to law; thus, it triggers the need for APA compliance.

<u>prosecutorial discretion</u> is it does provide an incentive for people to come out and identify themselves." [*Id.* (emphasis added)].

Any one of the above-discussed three traits of a substantive rule would independently subject the 2014 DHS Directive to the mandatory rulemaking procedures of the APA. In this case, the Directive qualifies under all three.

### III.  Breadth Of The Injunction

The Government additionally argues that because this Court found standing as to Texas and omitted *specific* findings as to injuries suffered by other states, the injunction should only apply to Texas.[15] This argument is contrary to both the dictates of the Constitution and the very arguments that the Government has recently made before other courts. The Constitution provides in Article I, Section 8, that Congress shall have the power:

> To establish an *uniform* Rule of Naturalization and uniform laws on the subject of Bankruptcies throughout the United States.

U.S. Const. art. I, § 8, cl. 4 (emphasis added). Obviously, the intent of the framers was to place in the bailiwick of Congress the power to establish immigration laws *and* the obligation to make such laws uniform.

The Government argued this very point to the United States Supreme Court in *Arizona v. United States*, 132 S. Ct. 2492 (2012). There, it alleged that Arizona's laws affecting illegal immigrants should be preempted because they disrupted the "comprehensive" federal scheme. The Court sustained this view, writing:

> Federal law makes a single sovereign responsible for maintaining <u>a comprehensive and unified system</u> to keep track of aliens within the Nation's borders. If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, "diminish[ing]

---

[15] The Government offers as support for this argument the claims presented by twelve other states and the District of Columbia who filed a brief as *amici curiae* suggesting that the 2014 DHS Directive could help their economies. While this assertion may be true, it does not affect the need for APA compliance.

11

> the [Federal Government]'s control over enforcement" and "detract[ing] from <u>the 'integrated scheme of regulation' created by Congress.</u>" *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 288–289, 106 S. Ct. 1057, 89 L. Ed. 2d 223 (1986). Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field (like the field of alien registration) that has been occupied by federal law. *See California v. Zook*, 336 U.S. 725, 730–731, 733, 69 S. Ct. 841, 93 L. Ed. 1005 (1949); *see also In re Loney*, 134 U.S. 372, 375–376, 10 S. Ct. 584, 33 L. Ed. 949 (1890) (States may not impose their own punishment for perjury in federal courts).

*Id.* at 2502 (emphasis added).

Most recently, in its *amicus curiae* brief in *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), the Government emphasized the "comprehensive federal statutory scheme for regulation of immigration and naturalization" established by the INA. [*See* United States' Brief as Amicus Curiae in Opposition to Rehearing En Banc, *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), ECF No. 75.]. (This is the same statutory scheme that the DHS has ordered its employees not to enforce.) Despite these past arguments, the Government now suggests for the first time here that this Court should apply one immigration scheme to Texas and a different one to the rest of the states. This is tantamount to conceding that the Government's arguments in 2012 to the Supreme Court in *Arizona* and in 2014 to the Ninth Circuit in *Brewer* were frivolous. Regardless, there is a lengthy history of precedent concerning the need for a uniform approach to immigration, and this Court sees no reason to depart from those cases.

Further, if the Government violates the procedural dictates of the APA, that violation affects the entire nation, not just the one state that points out the violation. The Court therefore denies the request to limit its injunction to apply only to Texas.

## IV.  The Preliminary Injunction Will Not Inflict Irreparable Harm On The Government

The States have objected to the Government's additional affidavits, which were filed after the issuance of the injunction.  Regardless, this Court, with one exception, finds that these affidavits add little to the substantive arguments previously made.  The exception is found in the affidavit of Gil Kerlikowske, the Commissioner of United States Customs and Border Protection ("CBP"), who articulates for the first time the DHS' position as to how DAPA might aid the DHS in its mission to protect the border.  He states that if a DAPA recipient is encountered by ICE or CBP agents to whom he or she can present documentation showing that he or she is a low-priority individual for removal, then those agents can simply "take no other action with regard to that individual."  [Doc. No. 150–2 at 4].  Counsel for the Government reiterated this reasoning to the Court during the March 19, 2015 hearing.

Importantly, however, as counsel for the Government admitted in open court, the Government does not need DAPA to effectuate this goal.  [*See, e.g.*, Hr'g Tr. 29–31, Mar. 19, 2015].  The DHS could conduct the same investigation and provide such documentation designating certain illegal immigrants as low-priority law enforcement targets without additionally awarding legal status and the other benefits previously described in detail. (In fact, the DHS has always had the ability to do this.  This Court's injunction does not affect that ability.)  Counsel for the Government explained that there might be a better turnout for this effort, however, if the DHS provided incentives.  [*Id.* at 30].  While the wisdom and legality of incentivizing illegal immigrants to remain in the country illegally may or may not be debated at trial, what this revelation makes abundantly clear is that the Government has a workable and legal alternative.[16]  The States have no such alternative.  When balancing the potential harms to

---

[16] Another reaffirmed conclusion drawn from the exchange between the Court and counsel for the Government at the most recent hearing is that the 2014 DHS Directive is a complete change of policy that requires, at the very least,

each side (as required under the preliminary injunction analysis), the scales of justice greatly favor the States.

Further, it is obvious that there is no pressing, emergent need for this program. If there had been such a need, the DHS could have implemented the program at any time in the last five or ten years, or even in the many decades preceding the 2014 DHS Directive. The Government has not shown any credible reason for why this Directive necessitates immediate implementation.

V.      **Plaintiffs Have Irreparable Injuries That Cannot Be Cured With Monetary Damages**

The last important issue addressed during the hearing on the Motion to Stay was the admission that money damages, if awarded, would in effect be the equivalent of having the Court order that the States (and their citizens) pay their own damages. While this Court in its February Opinion (and the parties no doubt in their briefings) assumed for injunction purposes that an award of money damages would not and could not make the States whole (if injunctive relief did not issue), this assumption was confirmed at the hearing by counsel for the Government. [Hr'g Tr. 26–27, Mar. 19, 2015]. An award of money damages to the Plaintiffs would, at least in large part, be paid for by the Plaintiffs. Therefore, it is irrefutable that, even if one assumes that the States' future harm was solely monetary,[17] an injunction would still be necessary to prevent irreparable harm to the States.

---

compliance with the APA. Instead of removing certain aliens as required by existing law, the DHS has changed the law to *incentivize* all qualifying parents of citizens and legal permanent residents who are illegally in the United States to remain in the United States. The 2014 DHS Directive represents a new mandatory program, implemented in the face of the INA's removal requirements, and must at least comply with the APA.

[17] This Court found that there were both monetary and non-monetary damages directly due to the 2014 DHS Directive.

14

## VI.     Conclusion

Having considered the Emergency Motion to Stay [Doc. No. 150], the briefing filed by both sides, and the argument of counsel, the Court hereby denies the Government's Motion to Stay its February 16, 2015 Order of Temporary Injunction.

Signed this 7th day of April, 2015.

                                          Andrew S. Hanen
                                          United States District Judge

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on April 14, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *William E. Havemann*
WILLIAM E. HAVEMANN
Attorney, Civil Division