# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

State of Texas; State of Alabama; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of South Carolina; State of South Dakota; State of Utah; State of West Virginia; State of Wisconsin; Paul R. LePage, Governor, State of Maine; Patrick L. McCrory, Governor, State of North Carolina; C.L. "Butch" Otter, Governor, State of Idaho; Phil Bryant, Governor, State of Mississippi; State of North Dakota; State of Ohio; State of Oklahoma; State of Florida; State of Arizona; State of Arkansas; Attorney General Bill Schuette; State of Nevada; State of Tennessee,

        Plaintiffs-Appellees,

v.

United States of America; Jeh Charles Johnson, Secretary, Department of Homeland Security; R. Gil Kerlikowske, Commissioner of U.S. Customs and Border Protection; Ronald D. Vitiello, Deputy Chief of U.S. Border Patrol, U.S. Customs and Border Protection; Sarah R. Saldaña, Director of U.S. Immigration and Customs Enforcement; León Rodríguez, Director of U.S. Citizenship and Immigration Services,

        Defendants-Appellants.

No. 15-40238

## PLAINTIFFS' SUPPLEMENTAL BRIEF ON MOTION FOR STAY PENDING APPEAL

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

J. CAMPBELL BARKER
MATTHEW H. FREDERICK
Deputy Solicitors General

APRIL L. FARRIS
ALEX POTAPOV
Assistant Solicitors General

OFFICE OF THE ATTORNEY GENERAL
209 W. 14th Street
Austin, Texas 78711-2548

Counsel for Plaintiffs-Appellees

Nothing in Appellants' Brief (cited as Br.*p*) identifies an "emergency" need to stay the preliminary injunction until resolution of this already expedited appeal. The preliminary injunction preserves the status quo, which has existed for decades, without touching the Executive's prosecutorial discretion not to pursue certain removal proceedings.

The district court's comprehensive opinion rightly found Plaintiffs likely to establish standing and entitlement to relief—all that is required at this stage. The court did not abuse its discretion by preliminarily enjoining the challenged program ("DAPA," for convenience).

## ARGUMENT

The district court has now denied Defendants' stay motion, 2015 WL 1540022 (Apr. 7, 2015) ("Stay Order"), a decision warranting deference here, *see* Pls.' Stay Opp. ("Opp.") 6 n.12 (5th Cir. Mar. 23, 2015).

## I.   DAPA IS NOT AN EXERCISE OF ENFORCEMENT DISCRETION.

**A.**   Defendants repeatedly claim that the preliminary injunction interferes with their enforcement discretion. Br.20 (non-justiciability); Br.33 (APA); Br.41 (notice-and-comment); Br.51 (public interest). That argument is mistaken. The injunction neither prohibits nor requires any removal proceedings, and it does not prevent the Executive from identifying aliens based on whether they are a removal priority. Instead, DAPA affirmatively grants work permits and lawful presence, which confers a plethora of benefits. ROA.601.

Defendants nowhere challenge the proposition that enforcement discretion "does not also entail bestowing benefits." ROA.4462; *see* ROA.705 (memorandum of INS

Commissioner Meissner) ("Prosecutorial discretion does not apply to . . . grants of benefits."). As this Court noted last Tuesday, "agency decisions to affirmatively do something are presumptively reviewable." *Gulf Restoration Network v. McCarthy*, No. 13-31214, 2015 WL 1566608, at *4. That is enough to resolve the issue. Even OLC has admitted that DAPA "carries with it benefits in addition to nonenforcement." ROA.512.

The district court and Plaintiffs identified numerous benefits conferred by DAPA. Defendants fail to even contest some, such as the Earned Income Tax Credit, unemployment insurance, and access to foreign travel via advance parole. *See* Opp.15; ROA.4461. As for the others, Defendants' responses are unavailing.

1. **Lawful presence.** The Executive admits that DAPA explicitly renders recipients "lawfully present." Br.45; ROA.84. It insists, however, that "lawful presence" is not the same as "legal status." Br.45. But it argued precisely the opposite to the Ninth Circuit, claiming that "'approved deferred action status' is 'lawful status' that affords a period of 'authorized stay' for purposes of issuing identification." ROA.1317 (*Arizona Dream Act* brief); *see* ROA.4158 (DACA FAQ: "'lawful presence,' 'lawful status' and similar terms are used in various . . . federal and state laws").

In any event, it is indisputably correct that "DAPA awards *some* form of affirmative status." ROA.4470 (emphasis added). Lawful presence carries significant legal consequences, including eligibility for Social Security, Medicare, the Earned Income Tax Credit, unemployment insurance, and other benefits. Opp.4. DAPA also tolls the recipients' *unlawful* presence under the INA's reentry bars. 8 U.S.C. § 1182(a)(9)(B)(i), (a)(9)(C)(i)(I); *see* ROA.512 (OLC Memo); ROA.4158 (FAQ 5). It also protects recipi-

ents from the consequences of their "continuing [immigration] offenses." ROA.714 (Meissner Memo); *see INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 n.3 (1984).

That DAPA is revocable in principle (Br.45) is irrelevant. The Executive still takes affirmative action in conferring lawful presence to begin with, and lawful presence is valuable while possessed. ROA.4485. Under the Executive's logic, granting a visa would not count as affirmative government action: Visas are revocable at the Executive's discretion, 8 U.S.C. § 1201(i), and aliens with revoked visas are removable, *id.* § 1227(a)(1)(B). Regardless, the prospect of revocation is exceedingly remote. Only 113 out of 591,555 DACA approvals have been revoked (0.019%), and none were revoked for discretionary reasons. ROA.2225-26.

**2.  Work permits.** Defendants assert that DAPA recipients' eligibility for work permits "result[s]" from a prior regulation. Br.46-47. But the simple fact is that, without DAPA, four million aliens are *not* eligible for work permits, and with DAPA they will be. *See* ROA.520 (OLC Memo) (deferred action "confer[s] eligibility [for] work authorization"). Indeed, this Court observed last Tuesday that DACA contains an "employment authorization provision," which the Court distinguished from "prosecutorial discretion." *Crane v. Johnson*, No. 14-10049, 2015 WL 1566621, at *3.

**3.  Social Security and Medicare.** Defendants concede that DAPA makes recipients eligible for "social security retirement benefits, social security disability benefits, or health insurance under [Medicare]." Br.48-49. That, in turn, makes recipients eligible for the Earned Income Tax Credit, which Defendants ignore. Their only response is that "generally" recipients would not receive Social Security or Medicare for at least five years. Br.49. This says nothing about whether DAPA is affirmative government action.

And by the Executive's own reckoning, DAPA will increase the number of Social Security beneficiaries. Letter from Stephen C. Goss, Chief Actuary, Social Security Administration 4 (Feb. 2, 2015), www.ssa.gov/OACT/solvency/BObama_20150202.pdf. This is not surprising, as the three-year DAPA terms are renewable.

**B.**   Defendants' example describing a policy of not prosecuting small-scale theft (Br.41) only illustrates the profound differences between DAPA and enforcement discretion. To make the two policies similar, the Executive would need an application process to confer open toleration of continued small theft for a renewable period of three years, as well as a panoply of additional benefits such as tax credits. *See* ROA.4462. What Defendants' example *actually* resembles is the separate memo defining three categories of priority for removal proceedings. ROA.558-63. That memo is neither enjoined nor challenged, as Defendants now admit (Br.11).

**C.**   The *Heckler* presumption would be overcome even if it applied. Opp.11-13; *see* ROA.4463. In addition to abdicating its statutory responsibilities, Opp.12, the Executive has rewritten immigration law—Congress has not given the Executive *carte blanche* to grant work permits or lawful presence,[1] and DAPA is not rooted in congressional acquiescence. PA.1359-64 (Stay Opp. App'x) (distinguishing past deferred-action programs in kind and in scale); ROA.516 (OLC Memo) (*Heckler* does not protect abdication or rewriting the law).

---

[1] Congress has created detailed criteria for obtaining lawful presence. *See, e.g.*, 8 U.S.C. § 1154(a)(1)(A), (B), (D)(i) (deferred action for VAWA self-petitioners); *id.* § 1101(a)(15) (defining nonimmigrant statuses); *id.* § 1201(a)(1) (issuance of nonimmigrant visas); *id.* § 1227(a)(1) (lack of valid nonimmigrant status as basis for removal); *id.* § 1227(d) (administrative stay of removal for T-or-U-nonimmigrant-status applicants; deferred action); *id.* § 1157(c)(1) (admission of qualifying refugees); *id.* § 1158(c) (non-removal of asylum recipients); *id.* § 1182(d)(5) (humanitarian parole); *id.* § 1254a (temporary protected status).

OLC also acknowledges that genuine case-by-case discretion is "critical" to the substantive legality of programs like DAPA. ROA.500, 510, 515. And the district court committed no clear error in finding that DAPA as implemented would entail no individual discretion. *Cf.* Br.42-44. The district court found that DACA will be representative of DAPA's implementation. ROA.4652, 4674, 4684; *see* ROA.86. And, as the district court correctly concluded, Defendants could not identify a single DACA application that was rejected for a genuinely discretionary reason. ROA.4586. (Defendants have even created a hotline so applicants can "make sure they can terminate removal proceedings" if they meet DACA criteria. ROA.4586.)

In contrast, the plaintiffs in *Crane* made no specific factual allegations about DACA's implementation. *Crane*, 2015 WL 1566621, at *6. Under those circumstances, this Court credited the DACA and DAPA disclaimers about case-by-case discretion. *Id.* at *7. But the record here,[2] in addition to the President's comments describing DAPA, *see* Stay Order *3; Opp.15, confirms that DAPA will not entail case-by-case discretion. *See also* Opp.15 n.38; *DOL v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) ("the substance, not the label, is determinative"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (disregarding similar disclaimer when there were contrary indications).

---

[2] The record includes a declaration that DAPA applications would be rubber-stamped. ROA.2100-01; ROA.4586.

## II. PLAINTIFFS ARE LIKELY TO SHOW STANDING.

The core standing question is whether a plaintiff has a "personal stake" in the outcome of the litigation. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014); *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). Plaintiffs here—representing 26 States—meet that standard.

**A. Driver's-license costs.** The district court found that DAPA would impose substantial costs on all of the Plaintiff States' driver's-license programs. ROA.4410; Opp.6-7. Multiple States submitted affidavits detailing these costs, Opp.7 & n.14,[3] and every State must pay a fee to comply with the REAL ID Act. ROA.4405-06. (*Crane* did not consider standing on this basis. *Crane*, 2015 WL 1566621, at *5 n.34.)

**1.** The self-inflicted-injury doctrine does not defeat standing.

**a.** The "possibility of an alternative remedy, of *uncertain availability* and effect, does not render [an] injury self-inflicted." *Okla. Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014) (emphasis added). And it is not remotely clear that States could withhold driver's licenses from deferred-action recipients, as Defendants suggest (Br.25). The Executive still cannot distinguish the equal-protection holding in *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), and its own brief in that case. *See* Br.28 (acknowledging holding that denying driver's licenses to deferred-action recipients is unlawful).

*Arizona Dream Act* also strongly suggested a broad preemption theory—that preventing deferred-action recipients from driving would impermissibly interfere with the

---

[3] At this preliminary-injunction stage, the question is simply *likelihood* of success in proving standing. As the district court explained, counsel "operated on a short schedule" given "the emergent nature of this temporary injunction," and Plaintiffs may well present additional evidence confirming their injuries. Stay Order *2 n.5.

federal decision to allow them to work. 757 F.3d at 1062-63. Analogously, this Court held a housing ordinance preempted when it made a lawful-presence classification. *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (2013) (en banc). And the Executive's amicus brief *there* argued for federal preemption of laws making immigration-status classifications if such laws prevent "obtaining other necessities of day-to-day existence." 2012 WL 4208119, at *2 (Sept. 6, 2012).

Defendants keep changing their position. Their stay motion backtracked from their *Arizona Dream Act* brief by arguing that States could deny driver's licenses to DAPA recipients "so long as the States base eligibility on existing federal alien classifications." Stay Mot. 7 (quotation marks omitted). But their Appellants' Brief now admits that Arizona *did* act based on a federal classification; it denied driver's licenses to all aliens accorded deferred action. Br.28. So Defendants' new position is that federal law "may" permit an exclusion "if the classifications are borrowed from federal law *and further a substantial state purpose.*" Br.29 (quotation marks omitted; emphasis added). But if Arizona did not have a "substantial" purpose (according to Defendants), presumably no other States do either. In short, as the district court noted, "it is apparent that the federal government will compel compliance by all states regarding the issuance of driver's licenses to recipients of deferred action." ROA.4599; *see Okla. Dep't*, 740 F.3d at 189-90 (State's injury not self-inflicted when Executive "stopped short, both in its brief and at oral argument, of stating that Oklahoma would be entitled" to enforce its law without federal interference).

Additionally, even if the Executive did not attempt to force States to provide driver's licenses to DAPA recipients, the recipients themselves (and their advocates)

would. *See* Appellants' Resp. to Mot. for Summ. Disposition 2, *Texas v. United States*, No. 15-40333 (5th Cir. Apr. 2, 2015) (group of potential DAPA recipients arguing for intervention in this case because they "fervently disagree" that States can refuse to grant them driver's licenses); *Arizona Dream Act*, 757 F.3d at 1058 (suit brought by five individual DACA recipients and an organization).

Even if States did have a choice in the matter, the only way to avoid the additional costs would be to deny licenses to a class of "individuals [the States] had previously decided should be eligible for them." ROA.4602. In other words, the States would face a choice between added financial costs or "a significant intrusion into an area traditionally reserved for a state's judgment." ROA.4602; *see* ROA.4404 (noting federal government's acknowledgment that power to issue driver's licenses belongs to States).

**b.**   Defendants also suggest States could recoup costs by increasing driver's-license fees. Br.27. This cannot defeat standing. States theoretically could pass on *any* financial injury through taxes or fees, yet States routinely have standing based on financial injuries. *E.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992) (Wyoming's "loss of specific tax revenues"); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160-62 (1981) (California's "direct financial stake"); *Maryland v. Louisiana*, 451 U.S. 725, 736-37 (1981) (States injured as "major purchasers of natural gas whose cost has increased").

Defendants' argument is particularly out of place here, given that part of each license's cost is imposed by the federal REAL ID Act. Opp.7 n.14. And while Defendants assert that the REAL ID Act is not mandatory (Br.27 n.2), "the states have no choice but to pay these fees," because if they do not, "their citizens will lose their rights to access federal facilities and to fly on commercial airlines." ROA.4606.

Moreover, Defendants' theorized option of passing on costs would fundamentally change Plaintiffs' policies. The district court found based on record evidence (ROA.2106-07) that, if a fraction of unauthorized aliens in Texas obtain DAPA and apply for driver's licenses, it would cost Texas over $100 to process each license—requiring a manifold increase in the $24 fee to make up the loss. ROA.4597. The only way to avoid this cost would be to abandon Texas's objective of affordable driver's licenses.

**c.** The self-inflicted-injury doctrine also could not apply here because Plaintiffs have not "manufacture[d]" standing by amending their driver's-license laws to create an injury. *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1143 (2013); *see* Opp.8. Nor have they made any "unreasonable decision . . . to bring about a harm that [they] knew to be avoidable." *St. Pierre v. Dyer*, 208 F.3d 394, 403 (2d Cir. 2000); *see id.* at 402 (an injury is self-inflicted "only if . . . [it] is so completely due to the plaintiff's own fault as to break the causal chain").

*Wyoming* confirms that the self-inflicted-injury doctrine does not apply here. There, Wyoming had standing to challenge action decreasing coal sales and resulting in "direct injury in the form of a loss of specific tax revenues"—even though Wyoming could have raised the tax rate or taxed something else. 502 U.S. at 447-48. The Court did not deny Wyoming standing because it selected the class of taxed items or the tax rate. Likewise, Plaintiffs do not lose standing because they chose who would be eligible for driver's licenses and how much they would have to pay.[4]

---

[4] Defendants' reliance on *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam), is misplaced. Not only do Defendants ignore the Court's more recent holding in *Wyoming*, but *Pennsylvania* turned on the particular nature of the constitutional provisions at issue (the Privileges and Immunities and Equal Protection Clauses), which "protect people, not States." *Id.* at 665. Moreover, *Pennsylvania*

Defendants suggest that any element of choice from a plaintiff is sufficient to defeat standing. Br.25-26. *Wyoming* rejects this, and this Court has too. *See, e.g., Texas*, 497 F.3d at 498 (no self-inflicted injury when Texas chose to invoke sovereign immunity to avoid financial injury). Familiar standing cases would be wrong under this view. *See, e.g., Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) (conservation groups established standing because "the whale watching and studying of their members [would] be adversely affected," even though members could have chosen to watch and study other species).

**2.** Defendants insist that the injury could be offset by various attenuated economic consequences of DAPA. Br.29-31. But courts routinely reject the concept of related gains that "offset" standing. Opp.9 & n.20; *accord, e.g., L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 657 (9th Cir. 2011) (plaintiff "has standing to challenge the . . . regulation even though . . . it may also have enjoyed some offsetting benefits from the [regulation's] operation"). Defendants rely on *Henderson v. Stalder*, which held that taxpayers lacked standing to challenge a specialty license plate's issuance because (i) the challenged plate cost no more than regular plates, (ii) plaintiffs' taxes would not increase, and (iii) the relevant regulation explicitly stated that the required administrative fee would offset the plate's cost. 287 F.3d 374, 379 (5th Cir. 2002). Nothing in *Henderson* suggests that offset considerations apply outside the narrow context of taxpayer standing or that a plaintiff must disprove every potential benefit of the challenged action.

---

stands at most for the proposition that taxation by one State is not inconsistent with taxation by another. 7 Fed. Prac. & Proc. Juris. § 4051.

Such an approach would be unworkable. For instance, in *Massachusetts v. EPA*, Massachusetts would have had to show that its injuries were not offset by economic benefits from carbon-emitting automobiles.

And even if a "standing offset" analysis could apply, the district court correctly found DAPA's potential economic benefits speculative. ROA.4429; *cf.* Br.30 (relying on ROA.2473's recitation of an ideological think-tank's claim that DAPA would expand Texas's tax base).

**3.** Defendants contend that a plaintiff's injury must be *certainly* impending under *Clapper*. Br.29-30. Plaintiffs satisfy that test. But what *Clapper* actually held is that standing can be established "if the threatened injury is 'certainly impending,' *or there is 'a "substantial risk" that the harm will occur.'*" *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Clapper*; emphasis added); *see Crane*, 2015 WL 1566621, at *7 (Owen, J., concurring) (citing *Watt*, 454 U.S. at 160-61, which found standing based on the Executive's refusal to experiment with non-cash-bonus bidding). Plaintiffs' detailed exhibits easily allowed the district court to find either standard satisfied.

**B.  Other costs.** Plaintiffs also have standing based on other costs, including education, healthcare, and law-enforcement services. Opp.9 & n.18. The district court found, for example, that Texas spends over $7,000 annually for each unauthorized alien in school and that Texas absorbed total education costs of almost $60 million in a single year relating to illegal immigration. ROA.4420. The district court also found that, in 2008 alone, Texas incurred over $716 million in uncompensated medical services for unauthorized aliens. ROA.4421. Plaintiffs presented additional evidence about their

costs, Opp.9 n.18, and the district court credited that evidence, ROA.4418, 4420-21, 4423, 4426.

The district court also found, based on record evidence, that DAPA will cause additional education, healthcare, and law-enforcement costs to Plaintiffs. *See* ROA.4428 ("The States rightfully point out that DAPA will increase their damages with respect to the category of services discussed above because it will increase the number of individuals that demand them."). Quite apart from any future increase in immigration, *see* Opp.9 n.19, there are two categories of unauthorized aliens who will impose these costs *only* as a result of DAPA. First, there are aliens who would have emigrated but for DAPA's benefits. ROA.4429. Indeed, the Executive has admitted as much. Goss Letter, *supra*, at 3 (stating that the challenged Directive would reduce emigration by a total of 382,000 people by the year 2050). Second, there are aliens who would have been removed but for DAPA. ROA.4429. Both of those findings are supported by record evidence. ROA.1998, 2000-05 (expert demographer).

In contrast, Mississippi in *Crane* submitted no evidence that any DACA-eligible aliens resided in the State or that it would incur any costs if such aliens arrived. *Crane*, 2015 WL 1566621, at *5; *cf.* ROA.4397 (finding that 500,000 of Texas's 1.6 million unauthorized aliens would be DAPA-eligible); ROA.4420-21 (detailing cost to Texas of each additional unauthorized alien). While Mississippi pointed only to a single study quantifying the total cost of illegal immigration, Plaintiffs introduced numerous declarations and exhibits, *see* ROA.1247-2437, 4222-4273, showing that DAPA would increase the number of aliens imposing costs, and the district court credited that evidence. ROA.4428.

The chain of causation Plaintiffs have established here is far less attenuated than standing theories the Supreme Court has endorsed in cases like *Watt*, *Japan Whaling*, and *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72-81 (1978). And it is certainly less speculative than the chain of causation accepted in *Massachusetts v. EPA*, premised on the "special solicitude" enjoyed by the States. 549 U.S. 497, 520 (2007); *see* Opp.9 n.21.[5]

    **C.   General arguments.** Defendants' general arguments against standing also fail.

First, Defendants cite cases suggesting that third parties have no standing to contest non-enforcement decisions. Br.20-21. Those cases are irrelevant because Plaintiffs do not challenge enforcement decisions or any form of enforcement discretion. *See supra* Part I.

Second, Defendants cite *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997), for the proposition that standing may be more difficult to demonstrate in constitutional cases. Br.19. But once an injury is shown, a plaintiff has standing regardless of whether the injury is caused by a statutory or constitutional violation. Additionally, Plaintiffs' case can be resolved, as the district court showed, under the APA without deciding any constitutional question.

Third, Defendants argue that immigration law involves delicate policy judgments. Br.21. Courts frequently address such cases. Opp.10-11. And none of Defendants' cited cases requires courts to deny standing simply because the case involves immigration. The Executive recently acknowledged that programs like DAPA "must be carefully

---

[5] Similarly, Defendants' brief fails to undermine Plaintiffs' *parens patriae* standing. Br.32; *see* Opp.9 & n.22.

scrutinized to ensure that [they] . . . do[] not seek to effectively rewrite the laws." ROA.516 (OLC Memo).

Finally, Defendants argue that standing is somehow *less* appropriate here because Plaintiffs are or represent States. Br.22. This is exactly backwards. As in *Massachusetts v. EPA*, the Plaintiff States have "surrender[ed] certain sovereign prerogatives" in the immigration field. 549 U.S. at 519. Just like in *Massachusetts*, Plaintiffs allege that the federal government "abdicated its responsibility." *Id.* at 505. Under such circumstances, Plaintiffs are entitled to "special solicitude." *Id.* at 520; *see Alden v. Maine*, 527 U.S. 706, 715 (1999) (States "retain the dignity . . . of sovereignty").

## III. PLAINTIFFS ARE LIKELY TO SUCCEED UNDER THE APA.

**A.** Plaintiffs are well within the APA's "zone of interests." Br.33. This test is not "especially demanding," and it must be applied in a manner consistent with "Congress's evident intent . . . to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quotation marks omitted); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1389 (2014). Plaintiffs meet this test in at least three ways. First, the Supreme Court has recognized "the importance of immigration policy to the States." *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012); *see* ROA.4454-55 (additional sources). Second, States have an interest in protecting their citizens by reserving jobs for those lawfully in the country, which is a key goal of immigration law. *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 (1991); *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990). Third, Plaintiffs are squarely within the zone of interests of the APA's notice-and-comment provi-

sion, which "is designed to ensure that affected parties have an opportunity to partici-pate in and influence agency decision making at an early stage." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992).

Defendants also argue that APA review is "implicitly preclude[d]." Br.34. But they identify no "clear and convincing evidence of legislative intention to preclude review." *Japan Whaling*, 478 U.S. at 231 n.4; *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984) (statute expressly allowed handlers and producers—but not consumers—to par-ticipate in agency process). Defendants rely primarily on 8 U.S.C. § 1252(g), which de-prives courts of jurisdiction to hear a claim "by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Br.34.[6] Plaintiffs' lawsuit (1) is not a claim brought "by or on behalf of any alien" and (2) does not concern any of the listed actions. IIRIRA's "theme" of protecting the Executive's discretion is artic-ulated through numerous specific provisions. *Reno v. AAADC*, 525 U.S. 471, 486-87 (1999) (listing sections). The existence of these numerous, specific provisions fore-closes—rather than suggests—the idea that the statute incorporates some broader ju-risdiction-stripping principle that would render the specific provisions redundant.

**B.** DAPA is a substantive rule requiring notice-and-comment procedures. De-fendants do not dispute the obvious point that DAPA is not tentative. Opps.13-14. That is enough to conclude that DAPA is no mere policy guidance—but there is more.

---

[6] Defendants also renew their mistaken argument that DAPA is simply an exercise of enforcement discretion. Br.33-35 (citing 6 U.S.C. § 202(5)).

1.    The APA's procedural provisions are triggered by "policies affecting individual rights and obligations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). *Ruiz* held that the government was required to use APA notice-and-comment procedures to promulgate a policy that changed the "eligibility requirements" for allocating assistance to Native Americans. *Id.* at 235-36. DAPA establishes similar eligibility criteria (*e.g.*, anyone entering after January 1, 2010, is ineligible, ROA.86), so *Ruiz* controls here.

By contrast, *Lincoln v. Vigil* is inapposite. *Cf.* Br.37. *Vigil* held that an agency's un-reviewable decision to "discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation" was not a substantive rule. 508 U.S. 182, 197 (1993). The Court made clear that the agency's decision "did not alter the [agency's] criteria for providing assistance." *Id.* at 198. And it expressly distinguished *Ruiz* on the basis that it involved "eligibility" criteria. *Id.* at 199.[7]

More broadly, as Defendants concede, an administrative action requires notice and comment when it "ha[s] a significant effect on the legal rights *or private interests* of third parties." Br.37 (emphasis added); *see* Opp.15; *Gulf Restoration*, 2015 WL 1566608, at *5. It is indisputable that DAPA will have an enormous effect on private interests: DAPA will grant *millions* lawful presence, work permits, and many benefits.

2.    In addition, DAPA is a substantive rule because it restrains the discretion of Executive decisionmakers. Opp.15; *see Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946

---

[7] Defendants' argument (Br.7) about the 2015 DHS appropriation is another version of their mistaken argument that DAPA is an exercise of enforcement discretion. This appropriation deals with "necessary expenses for enforcement of immigration . . . laws, detention and removals" and money to "identify aliens convicted of a crime who may be deportable, and to remove them from the United States once they are judged deportable." Pub. L. No. 114-4, 129 Stat. 39, 42-43.

(D.C. Cir. 1987). As described above, DAPA allows no discretion with respect to evaluating applications (though it would qualify as a substantive rule simply by *constraining* officials' discretion). Opp.15; *see Gen. Elec. Co. v. EPA*, 290 F.3d 377, 384 (D.C. Cir. 2002) (possibility of discretion in unusual cases does not undermine an action's binding force in standard cases); *U.S. Telephone Ass'n v. FCC*, 28 F.3d 1232, 1234-35 (D.C. Cir. 1994) (substantive rule where agency only possibly departed from criteria in 8 out of 300 cases). In any event, on any number of other issues—such as the entry date, biometrics requirement, necessary fee, and deferred-action period—DAPA indisputably eliminates discretion altogether. Opp.15 n.39; *see McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) (substantive rule where document "conclusively dispos[ed] of certain issues").

In response, Defendants assert that instructions to agency officers cannot be substantive rules. Br.39. That is refuted by the cases Defendants cite. *See Mada-Luna v. Fitzparick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987) (notice-and-comment procedures required if action "limits [the] administrative discretion" of an "agency, *or its implementing official*") (emphasis added); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C. Cir. 1986) (regulation at issue exempt only because it was tentative).

The two main cases cited by Defendants are even less helpful to them because they do not address the general-statement-of-policy exception; they rely on the separate exception for rules of internal agency procedure. Opp.13 n.29; Br.39. The "APA's notice and comment exemptions must be narrowly construed," *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995), so the Executive must be clear

about which exemption it claims. *Cf. Gen. Elec.*, 290 F.3d at 382.[8] And the internal-procedural-rule exemption does not apply to actions, like DAPA, that have a "substantial impact" on regulated parties. *Kast Metals*, 744 F.2d at 1153; *see Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1050 (D.C. Cir. 1987) (relying on *Kast Metals* and finding rule was not "likely to have the intent or effect of substantially altering party behavior").

Defendants also suggest that constraints on agency decisionmakers require notice and comment only if they have "a coercive impact." Br.40. *Ruiz* would have been wrongly decided under that view. And the D.C. Circuit expressly rejected the argument that substantive rules must be "backed by a threat of legal sanction." *Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (1999). The question is simply whether "a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion." *Young*, 818 F.2d at 946; *Am. Trucking Ass'ns Inc. v. ICC*, 659 F.2d 452, 463 (5th Cir. 1981).

**3.**    Finally, Defendants resort to policy arguments. Br.41-42. But Congress has already weighed "the interests of agency efficiency and public input," *Kast Metals*, 744 F.2d at 1153, and provided that notice and comment will generally be available, unless one of the exemptions applies. And the need for public participation is at its zenith when dealing with a change in the law as far-reaching, novel, and significant as DAPA.

---

[8] In passing, Defendants cite (Br.47) another exemption, concerning "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). Lawful presence is an immigration status, not a grant of money, goods, services, or any kind of "public benefit." Neither are work permits or travel rights. This exemption, moreover, must be limited to instances where the government has a "'proprietary' or other unique interest." *Hous. Auth. of City of Omaha v. U.S. Hous. Auth.*, 468 F.2d 1, 9 (8th Cir. 1972) (explaining that an expansive and acontextual reading of this exemption could "include virtually every activity of government" and "carve the heart out of the notice provisions"). Indeed, if the "public benefits" exemption were read as broadly as Defendants suggest, *Ruiz* (which did concern benefits) would be wrongly decided.

**IV. THE OTHER STAY FACTORS SIGNIFICANTLY FAVOR PLAINTIFFS.**

**A.**  Defendants have not shown that they will suffer irreparable injury in the time between now and resolution of this expedited preliminary-injunction appeal. Defendants' argument about "national security" and "protect[ing] the Homeland" (Br.52) falls manifestly short of the national-security argument in *Youngstown*, which concerned the grave realities of the Korean War but still could not rescue the unlawful Executive action there. Opp.16.

Here, Defendants argue that it would be more expedient to identify in advance unauthorized aliens who are a low priority for removal, allowing field officers to process them more quickly in the future. Yet the injunction does not stop Defendants from giving aliens documents assigning a priority level, as the district court explained and Defendants admitted below. Stay Order *7. The preliminary injunction only stops Defendants from conferring lawful presence, work permits, and multiple benefits, as supposed "incentives" to facilitate that program. *Id.* The inability to grant unauthorized benefits does not impinge on enforcement discretion (as Defendants admitted in the district court, *id.* at *6).

Moreover, the Executive does not dispute that it never perceived an emergency need to hand out these benefits until recently, *id.* at *8—just after the November elections in the President's second Term, when the Executive explained DAPA as a "change [in] the law" based on Congress's failure to "[p]ass a bill." ROA.234.

**B.**  Even if Defendants could establish some modicum of irreparable injury, it would not outweigh Plaintiffs' irreversible injury from allowing DAPA to take effect before a final judgment. In the single page addressing this factor (Br.51), Defendants

do not dispute that the preliminary injunction preserves the status quo—"the last peaceable uncontested status" between the parties. 11A Fed. Prac. & Proc. Civil § 2948. Nor do they confront the clear-error standard for reviewing the district court's finding of irreparability, or address Defendant Rodríguez's admission that DAPA cannot readily be undone. Opp.17 n.44. Defendants' only argument—other than wrongly claiming that no injuries exist—is that Plaintiffs' injuries are not irreversible because deferred action can be revoked. Br.51. Revocation, however, does not erase harms that have already occurred, such as money spent on healthcare or on processing a flood of driver's-license applications.

C.   Defendants' argument that an injunction is against the public interest because of DAPA's alleged beneficial effects on local economies and law enforcement (Br.53-54) fails to grapple with the abuse-of-discretion standard of review. The district court heard those arguments but rightly recognized that "the public interest factor that weighs the heaviest is ensuring that actions of the Executive Branch . . . comply with this country's laws and its Constitution," such that it is "far preferable to have the legality of these actions determined before the fates of over four million individuals are decided." ROA.4695-96; *see Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982) (courts act within the "broad public interest[]" when they "maintain" the "proper balance" of "the separation of powers"). Nor are the supposed benefits "undisputed." Br.54. Plaintiffs dispute them, Opp.20 n.49, and the district court correctly found them "speculative," ROA.4429.

The district court rightly observed that, under Defendants' position, future Presidents could cite limited resources "to cease enforcing environmental laws, or the Voting

Rights Act, or even the various laws that protect civil rights and equal opportunity." ROA.4640; *see* ROA.178. Defendants have yet to acknowledge this point, let alone respond to it.

**D.**   Lastly, the Executive's unclean hands are yet another reason to deny the equitable relief of a stay. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (unclean-hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"). On April 7, the district court found that the Executive committed "misconduct" in misrepresenting whether it had immediately implemented Expanded DACA. Order, 2015 WL 1540152, at *6.

## V.   The Injunction Properly Applies Nationwide.

Defendants attack the preliminary injunction's nationwide scope (Br.54-56) without acknowledging that they *never* suggested a geographical limit in their district-court briefs on the preliminary injunction. *See* Opp.19. Defendants forfeited this argument, and their delay in raising it reflects how strange it is.

Defendants' reliance on 5 U.S.C. § 705 raises the question whether allowing DAPA to take effect anywhere would cause irreparable injury. It would, as previously explained, and none of Defendants' authorities speak to circumstances like those here. Opp.18-19 (distinguishing *Meinhold* and *Califano*); *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (full refund of payments improper when challenger owed agency money). *Califano v. Yamasaki* actually affirmed nationwide class certification and a nationwide injunction. 442 U.S. 682, 702-06 (1979).

Defendants do not dispute that the challenged program confers lawful presence and work permits that are valid *nationwide*. They suggest that it is "attenuated" to envision that *any* of the millions of eligible aliens would either leave Texas (or a Plaintiff State) to get DAPA and return, or move from a non-plaintiff State to Texas (or another Plaintiff State). Br.56. But this is a substantial certainty—and clearly a "substantial risk," *Susan B. Anthony List*, 134 S. Ct. at 2342—given the right to free interstate movement, the enormous number of affected aliens, and the size of these States' economies.

Finally, Defendants do not deny (Br.54-56) that Plaintiffs' claims, when proven, require wholesale invalidation of DAPA. Opp.20. In that regard, the claims are similar to the claim in *Massachusetts*: the remedy there was not and could not be limited to Massachusetts simply because a non-plaintiff State opposed regulating carbon emissions. And it was entirely appropriate for the district court to base "the scope of preliminary injunctive relief" on both the "likelihood of success and [the] showing of irreparable harm." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009); *see* Stay Order *7.

## Conclusion

Defendants' stay motion should be denied.

Respectfully submitted.

LUTHER STRANGE
Attorney General of Alabama

MARK BRNOVICH
Attorney General of Arizona

LESLIE RUTLEDGE
Attorney General of Arkansas

PAMELA JO BONDI
Attorney General of Florida

SAMUEL S. OLENS
Attorney General of Georgia

LAWRENCE G. WASDEN
Attorney General of Idaho

TOM C. PERRY
CALLY YOUNGER
Counsel for the Governor of Idaho

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
Counsel for the State of Indiana

DEREK SCHMIDT
Attorney General of Kansas

JAMES D. "BUDDY" CALDWELL
Attorney General of Louisiana

PAUL R. LEPAGE
Governor of Maine

BILL SCHUETTE
Attorney General for the People of
Michigan

DREW SNYDER
Counsel for the Governor of
Mississippi

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

/s/ Scott A. Keller
SCOTT A. KELLER
Solicitor General

J. CAMPBELL BARKER
MATTHEW H. FREDERICK
Deputy Solicitors General

APRIL L. FARRIS
ALEX POTAPOV
Assistant Solicitors General

OFFICE OF THE ATTORNEY GENERAL
209 W. 14th Street
Austin, Texas 78711-2548

Counsel for Plaintiffs-Appellees

TIMOTHY C. FOX
Attorney General of Montana

DOUG PETERSON
Attorney General of Nebraska

ADAM PAUL LAXALT
Attorney General of Nevada

ROBERT C. STEPHENS
Counsel for the Governor of North
Carolina

WAYNE STENEHJEM
Attorney General of North Dakota

MICHAEL DEWINE
Attorney General of Ohio

ERIC E. MURPHY
Co-counsel for the State of Ohio

E. SCOTT PRUITT
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

MARTY J. JACKLEY
Attorney General of South Dakota

HERBERT SLATERY III
Attorney General and Reporter of
Tennessee

SEAN D. REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia

BRAD D. SCHIMEL
Attorney General of Wisconsin

### CERTIFICATE OF SERVICE

I certify the service of this document by ECF or email on April 14, 2015 upon the following:

Beth S. Brinkmann
beth.brinkmann@usdoj.gov

Jeffrey A. Clair
jeffrey.clair@usdoj.gov

Kyle R. Freeny
kyle.freeny@usdoj.gov

William E. Havemann
william.e.havemann@usdoj.gov

Scott R. McIntosh
scott.mcintosh@usdoj.gov

Benjamin C. Mizer
benjamin.c.mizer@usdoj.gov

*Counsel for Defendants-Appellants*

/s/ Scott A. Keller
SCOTT A. KELLER

### CERTIFICATE OF COMPLIANCE

1.    I certify that, on April 14, 2015, this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's electronic-document-filing system.

2.    I certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the electronic submission has been scanned with the most recent version of commercial virus-scanning software and was reported free of viruses.

3.    I certify that this supplemental brief complies with the word limit set in this Court's March 24, 2015 order because it contains 5,996 words.

/s/ Scott A. Keller
SCOTT A. KELLER